**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

-----------------------------------------------------x

Ashley Dover, Katoria Greene, and
Alonia Perkins,

                    Plaintiffs,

           v.

United States of America,

                    Defendant.

**COMPLAINT**

Case No.

-----------------------------------------------------x

Plaintiffs, Ashley Dover, Katoria Greene, and Alonia Perkins, by and through their attorneys, The Jacob D. Fuchsberg Law Firm, LLP and Untiedt Dabdoub, PLLC, for their Complaint against Defendant as above captioned, bring claims and allege as follows upon information and belief:

## **INTRODUCTION**

1.    Lenton Jerome Hatten (hereinafter "Officer Hatten") was a former sports specialist or correctional officer at Federal Correctional Institute, Tallahassee (hereinafter "FCI Tallahassee") who used his position and authority to stalk, sexually abuse, harass, assault, and/or rape at least 11 women who were incarcerated at FCI Tallahassee in the custody of the United States Bureau of Prisons (hereinafter "BOP") while he was employed there. Instead of protecting the women who were

under his care and control, Officer Hatten was allowed and emboldened by BOP to prey upon them.

2. Plaintiffs Ashley Dover (hereinafter "Ms. Dover"), Katoria Greene (hereinafter "Ms. Greene"), and Alonia Perkins (hereinafter "Ms. Perkins") were each a victim who was sexually abused by Officer Hatten while incarcerated at FCI Tallahassee, an all-female, low-security federal prison. Over time, Officer Hatten groomed, manipulated, and coerced each Plaintiff into sexual submission, using the power and resources that he had at his disposal as a correctional officer as well as a sports specialist who supervised many prisoners who worked in the recreation department (colloquially known as "rec").

3. Officer Hatten had an apparent *modus operandi* that was known to other BOP staff where he would exploit his power as a correctional officer and isolate himself with female prisoners in areas of FCI Tallahassee that were known to have no security cameras. For instance, as a sports specialist, he was able to, and often did, isolate himself with a woman in the recreation shack (hereinafter "rec shack"), which is a small shed located in the far back of the recreational yard. There was no security camera inside the rec shack; there was one at the entrance that would apparently capture in real time who arrived and left the rec shack, but not what occurred inside. Officer Hatten had key to the rec shack, and could lock prisoners inside as he desired. Other isolated areas within FCI Tallahassee without security

cameras where Officer Hatten would spend time alone with prisoners included an area by the laundry facilities; and the second floor of a recreational building (which is separate from the rec shack), commonly known as "upstairs rec."

4.     Plaintiff Ms. Greene is one of the victims who were sexually abused by Officer Hatten. Ms. Greene was incarcerated at FCI Tallahassee starting in or around February 2017 until she was released from BOP custody in or around December 2022, except for an interim period when she was incarcerated at Federal Prison Camp Marianna (hereinafter "Marianna Camp") instead. Officer Hatten initiated sexual contact with Ms. Greene in or around summer of 2019 when he would rub himself against her back or smack her buttocks in the officers' station located in upstairs rec, and make inappropriate sexual comments to her. Sexual abuse escalated in or around the fall of 2019 when Officer Hatten instructed Ms. Greene to enter his office in the rec shack and exposed his erect penis to her. Following this incident, Officer Hatten continued to make sexually explicit comments to Ms. Greene. He also groomed, preyed upon, and manipulated her psychologically by giving her contrabands such as toiletries, food, clothing, and jewelry and by making her promises that he would assist in her application for a reduction in sentence and early release under the Coronavirus Aid, Relief, and Economic Security (hereinafter "CARES") Act, using his connections with other BOP staff members.

5. In or around July 2021, Officer Hatten escalated his abuse and forced Ms. Greene to perform oral sex on him and vaginally raped her in a secluded storage room behind the laundry, where he knew there was no security camera. He knew and exploited the fact that Ms. Greene was working in laundry and had to be in the laundry area during the early morning hours. For two months leading up to September 2021, in total, Officer Hatten forced Ms. Greene to provide him with oral sex on about four separate occasions and vaginally raped her twice. All the assaults occurred in the same storage room behind the laundry. Officer Hatten never wore a condom during any of his rapes of Ms. Greene. Within a week of the last assault in September 2021, Ms. Greene was transferred to Marianna Camp, thereby briefly escaping Officer Hatten, but then was brought back to FCI Tallahassee in December 2021 and placed in the special housing unit (hereinafter "SHU") where Officer Hatten continued to make sexual comments to her. Ms. Greene attempted to stay away from Officer Hatten as best as she could. Nonetheless, Officer Hatten continued to make sexual advances to her including one additional occasion when he exposed his penis to her and propositioned her for sex and another occasion when he patted her buttocks on or around March 1, 2022.

6. Plaintiff Ms. Perkins is another victim who was sexually abused by Officer Hatten. Ms. Perkins was incarcerated at FCI Tallahassee from around January 2021 through around August 2023. Similar with Ms. Greene, Officer Hatten

began crossing the proper boundaries between a prisoner and an officer by first making sexually inappropriate comments to her and then providing her with contraband items such as food, cosmetics, and jewelry. Officer Hatten manipulated Ms. Perkins's vulnerability where she was relying on her family, including her children, to fund her commissary account for daily sustenance. He groomed her by providing her with some items that she could sell and made it impossible for her to resist or report him.

7. In or around May 2021, Officer Hatten escalated his abuse when he locked Ms. Perkins in the rec shack where he knew there was no security camera inside, and forced her to give him oral sex. Even though BOP staff should have noticed Officer Hatten's recurrent behavior of locking a prisoner into the rec shack alone with him, nothing was done to stop his suspicious behavior. After this assault, Ms. Perkins did everything possible to avoid Officer Hatten, even though he continued to approach her and make sexual propositions. Throughout the remainder of his time at FCI Tallahassee until he resigned in or around August 2022, Officer Hatten continued to ask Ms. Perkins for oral sex.

8. Plaintiff Ms. Dover is another victim who was sexually abused by Officer Hatten. Ms. Dover was incarcerated at FCI Tallahassee from around 2017 through around December 2022 when she was released from BOP custody. Ms. Dover's interaction with Officer Hatten became frequent in or around the end of

2021, when she was assigned to work as the morning administrative clerk in rec. As with Ms. Greene and Ms. Perkins, Officer Hatten's abuse began with him making sexual comments about Ms. Dover's body. Over time, he began groping her breasts, buttocks, and vagina over her clothes. As with other victims, Officer Hatten also began to bring Ms. Dover contrabands such as perfume, jewelry, lotions, and candy.

9. In or around the spring of 2022, Officer Hatten escalated his abuse of Ms. Dover when he called her to the rec shack at around 6:00 AM. This unusual behavior should have been noticed by other BOP staff members because Ms. Dover's shift supervisor, Officer Cornelius Jones, was not present that early and would not call her to work. It is highly unusual for a prisoner and an officer to spend time alone in the rec shack with no one else around, as would be the case at 6:00 AM. Officer Hatten took this opportunity to initially rub Ms. Dover's buttocks and groin over her clothes, then to forcibly put her hand on his erect penis, and finally to push her down to give him oral sex while he made comments about her lips. Ms. Dover tried to suggest that someone may come in a futile attempt to end the rape, but Officer Hatten forced her to continue. Following this assault, Officer Hatten continued to grope Ms. Dover over the clothes and make sexually explicit comments until he was walked off in or around August 2022.

10. Ms. Dover believes that the reason she was not raped again was because Officer Hatten was repeatedly assaulting another victim, Bonnie Hernandez

(hereinafter "Ms. Hernandez"). Ms. Dover knew this because on several occasions, Officer Hatten ordered Ms. Dover to act as a lookout while he engaged in sexual activities with Ms. Hernandez in the locked rec shack. Officer Hatten's blatant and apparent sexual abuse, which was widely known throughout the facility and yet condoned until his resignation in August 2022, indicated to Ms. Dover the rape culture at FCI Tallahassee and BOP staff's willful blindness to it.

11.    Officer Hatten's abuse of prisoners, for instance of Ms. Hernandez, was not a secret. Upon information and belief, Officer Hatten publicly acknowledged his sexual liaison with Ms. Hernandez on or around May 8, 2022, in front of prisoners and staff. At a Mother's Day celebration at FCI Tallahassee on that day, Officer Hatten took the microphone to give a special, public thanks to Ms. Hernandez, stating: "I couldn't have done this without the help of Ms. Hernandez." He also gave her a pair of gloves as a Mother's Day gift, which was not allowed. From these incidents, Officer Hatten's suspicious conduct and preferential treatment towards certain women was a widely known fact throughout FCI Tallahassee. Yet, BOP allowed him to roam the facility with numerous opportunities to isolate, stalk, harass, abuse, and assault women including the Plaintiffs at least until August 2022, when Officer Hatten decided to resign amid a criminal investigation that was initiated by Ms. Hernandez.

12.     As is common with prison sexual abuse victims, Plaintiffs suffered their sexual abuse in silence, lest they were retaliated against or deprived of the modest privileges they had as incarcerated individuals. Officer Hatten exercised complete dominion and power over them as a correctional officer, as he had the key to their cells and control over their prison jobs, safety, health, welfare, and contact with the outside world. Other BOP officers who knew or should have known about Officer Hatten's sexual abuse permitted, condoned, enabled, or acquiesced to his misconduct, amplifying the Plaintiffs' fear of retaliation and sense of hopelessness. Plaintiffs only felt comfortable seeking legal counsel after Officer Hatten stopped working at FCI Tallahassee and when Plaintiffs were each to be released from BOP custody.

13.     On April 4, 2023, Officer Hatten was indicted for his sexual abuse of Ms. Hernandez, which was in violation of 18 U.S.C. § 2243(b). He quickly pled guilty on May 25, 2023, admitting in a statement of facts accompanying his plea agreement that he had engaged in sexual relationship between October 2021 and August 2022 with Ms. Hernandez. He was sentenced to three months of incarceration and five years of supervised release on August 24, 2023. *See United States v. Hatten,* No. 4:23-cr-18 (RH) (MAF) (N.D. Fl.). If the case had proceeded to trial, the Government would have proven beyond a reasonable doubt that Officer

Hatten had used FCI Tallahassee as his playground, systematically grooming, manipulating, preying upon, and repeatedly raping Ms. Hernandez.

14.    Prior to Officer Hatten's guilty plea on May 25, 2023, United States had in its possession several other victims' claims of abuse against Officer Hatten including the Plaintiffs' torts claim forms. The extent to which these claims were investigated by the Government is unclear. By counsel, Ms. Greene and Ms. Dover submitted victim impact statements to the Government prior to Officer Hatten's sentencing in August 2023; Ms. Greene also underwent a voluntary interview with the Government agents in October 2023 to report her abuse. Plaintiffs did not receive any follow-up contact or any other update regarding Officer Hatten to date. He has not been criminally charged with any additional count.

15.    The Department of Justice (hereinafter "DOJ")'s refusal to prosecute BOP officers for sexual abuse is a well-known phenomenon. In another federal prison in Florida, Federal Correctional Coleman, there were at least six BOP officers who admitted in sworn statements to have sexually abused at least 10 female prisoners. DOJ's Office of the Inspector General (hereinafter "OIG") declined to investigate or prosecute any of these officers.[1]

---

[1] S. PERMANENT SUBCOMM. ON INVESTIGATIONS, REP. ON SEXUAL ABUSE OF FEMALE INMATES IN FEDERAL PRISONS, 18 (Dec. 13, 2022), https://www.ossoff.senate.gov/wp-content/uploads/2022/12/PSI-Embargoed-Staff-Report-re-Sexual-Abuse-of-Female-Inmates-in-Federal-Prisons.pdf at 3.

16.     During relevant times, Officer Hatten's recurrent sexual abuse of incarcerated persons was obvious to various agents, servants, contractors, and employees of BOP, including but not limited to unit managers, counselors, correctional officers, lieutenants, department heads, captains, supervisors, executive staff, associate wardens, wardens, and investigators at FCI Tallahassee. Throughout Officer Hatten's employment at FCI Tallahassee until his resignation in or around August 2022, BOP personnel deliberately ignored alarming warning signs and sex abuse allegations against Officer Hatten.

17.     It was apparent to Plaintiffs and other victims incarcerated at FCI Tallahassee that BOP personnel would not intervene to prevent Officer Hatten's sexual assaults, let alone adequately discipline, supervise, or reprimand him in accordance with BOP's purported zero-tolerance policy against suspected staff sex abuse on prisoners. Upon information and belief, at least by 2020, BOP employees were aware that Officer Hatten was spending time alone with female prisoners and engaging in inappropriate sexual and/or flirtatious interactions with them. This highly abnormal behavior continued unchecked throughout Officer Hatten's tenure at FCI Tallahassee, with the acquiescence of other BOP officers who were acting within the course and scope of their employment.

18.     One of the primary reasons Officer Hatten was able to continue abusing so many women for so long, including Plaintiffs, is because his fellow officers did

not follow the operating protocols by sharing supervisory duties with him. Upon information and belief, two officers are required to be present during shifts to jointly supervise prisoners who work in rec or laundry. Therefore, Officer Hatten should never have been alone with prisoners. However, BOP staff would frequently leave Officer Hatten to supervise prisoners by himself, including behind locked doors and/or during early morning hours. Officer Hatten took advantage of his fellow officers' dereliction of duties to accost, isolate, imprison, harass, abuse, assault, and rape women right under the eyes of the BOP.

19.   Officer Hatten took female prisoners to blind spots within FCI Tallahassee that were not captured by security cameras, contrary to the existing protocols. BOP personnel who were tasked with monitoring security cameras knew that Officer Hatten often interacted with incarcerated persons in these blind spots and stayed there for lengthy periods of time for no apparent reason. There was no intervention to correct this.

20.   Officer Hatten brought contraband into FCI Tallahassee and used them as part of his *modus operandi* in sexual abuse. He knew and exploited how valuable contraband such as cosmetics and jewelry are in prison, further trapping his victims financially as well as exposing them to a threat of punishment for possessing contrabands if they were to report him. BOP personnel who were tasked with inspecting prisoners' cells or personal effects knew that the Plaintiffs had certain

items that must have been brought in from the outside. There was no intervention to correct or investigate this.

21. Suspicions and allegations of Officer Hatten's sexual abuse abounded at FCI Tallahassee by the end of 2020, as many BOP employees saw, knew of, and disregarded Officer Hatten's suspicious interactions with incarcerated persons, some of which amounted to flagrant violations of FCI Tallahassee's security or operating protocols. Nevertheless, until August 2022, Officer Hatten continued to work as a sports specialist and/or correctional officer at FCI Tallahassee with the willful ignorance and tacit approval of his colleagues and/or supervisors, leaving countless victims in his wake, including Plaintiffs.

22. It was only through the deliberate indifference, recklessness, carelessness, gross negligence, and negligence of other BOP personnel, as well as abject systemic failures at FCI Tallahassee and BOP, that Officer Hatten's sexual abuse was able to occur and could continue unabated until August 2022.

23. As a result of the forementioned deliberate indifference, recklessness, carelessness, gross negligence, and negligence of other BOP personnel as well as systemic failures at FCI Tallahassee, Plaintiffs were forced to engage in recurrent sexual encounters with Officer Hatten by threats of force or coercion. For each victim, what initially started as grooming and sexual comments eventually developed into assaultive rapes in 2021 or 2022. With the benefit of willful blindness

or negligence of his coworkers, Officer Hatten became increasingly aggressive and threatening over time, using FCI Tallahassee as his personal brothel.

24.    As prisoners under Officer Hatten's custodial, supervisory, and disciplinary authority, Plaintiffs did not have a meaningful escape from his predatory conduct. They felt that they had no choice but to comply with Officer Hatten's abuse. They knew that he could take away their privileges, jobs, outside contact, or even put them in the SHU, thereby lengthening their prison sentence. They also feared that their reports regarding Officer Hatten would not be believed or taken seriously by the authorities. Indeed, this fear was proven true. Even after Ms. Hernandez took it upon herself to report Officer Hatten, the Government failed to explore the severity, frequency, and magnitude of Officer Hatten's abuse fully or accurately during his criminal proceeding, resulting in a mere 3-month sentence that does not begin to capture the egregious circumstances herein. Moreover, it was widely known among prisoners that after reporting Officer Hatten, Ms. Hernandez was placed in the SHU for "investigation," which further deterred other victims including the Plaintiffs from reporting Officer Hatten while in custody.

25.    Plaintiffs Ms. Dover, Ms. Greene, and Ms. Perkins each experienced catastrophic and unnecessary pain and suffering because of Defendant's egregious disregard for, and carelessness towards, Plaintiffs' safety and well-being despite the myriad warning signs regarding Officer Hatten's abhorrent conduct.

26.     Plaintiffs bring this suit under the Federal Tort Claims Act (hereinafter "FTCA"), 28 U.S.C. §§ 2671, *et seq.*, in connection with the deficient supervision and custodial care provided to them by various BOP personnel within the scope of their employment with the BOP, which in turn resulted in Officer Hatten's recurrent sexual abuse.

27.     Plaintiffs seek redress for Defendant's unlawful conduct, which caused them to suffer permanent and catastrophic injuries.

## JURISDICTION AND VENUE

28.     This Court has original subject matter jurisdiction of this action pursuant to 28 U.S.C. §§ 1331 and 1346(b)(1) as arising under the Constitution, laws, and/or treaties of the United States of America. Plaintiffs' claims are predicated, in part, upon the FTCA, 28 U.S.C. §§ 2671, *et seq.*, authorizing actions seeking relief against the United States.

29.     This Court has personal jurisdiction because the alleged incidents occurred within the confines of the State of Florida.

30.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b)(2) and 1402(b), as a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred within the boundaries of this District and Division, in the County of Leon.

## CONDITIONS PRECEDENT TO THIS LAWSUIT

31.     Plaintiffs have properly complied with the requirements of 28 U.S.C. § 2675 by presenting an Administrative Claim against the United States of America, which provided the Government with adequate notice regarding Officer Hatten's abusive conduct and other BOP personnel's negligence related thereto. Each Plaintiff's Claim was timely filed with the BOP within two (2) years of the accrual of the causes of action. Specifically, Ms. Dover's Claim was filed on or around May 31, 2023; Ms. Greene's Claim was filed on or around February 27, 2023; and Ms. Perkins's Claim was filed on or around April 17, 2023.

32.     On November 1, 2024, the BOP unilaterally denied each of the Plaintiffs' Claims. By filing this action within six months of that denial, each Plaintiff has hereby properly exhausted requisite administrative remedies under 28 U.S.C. §§ 2401(b) and 2675(a). Moreover, this action is timely brought within the statutory time limits provided in 28 U.S.C. §§ 2401(b) and 2675(a).

## PARTIES

### Plaintiffs

33.     At all times relevant hereto, Plaintiff Ms. Dover was an adult prisoner in the custody of BOP, incarcerated in a Federal Correctional Institution located at 501 Capital Cir NE, Tallahassee, FL 32301, commonly known as FCI Tallahassee.

Ms. Dover was released from FCI Tallahassee in or around December 2022, and currently resides in the State of Illinois.

34.    At all times relevant hereto, Plaintiff Ms. Greene was an adult prisoner in the custody of BOP, incarcerated in a Federal Correctional Institution located at 501 Capital Cir NE, Tallahassee, FL 32301, commonly known as FCI Tallahassee. Ms. Greene was released from FCI Tallahassee in or around December 2022, and currently resides in the State of Georgia.

35.    At all times relevant hereto, Plaintiff Ms. Perkins was an adult prisoner in the custody of BOP, incarcerated in a Federal Correctional Institution located at 501 Capital Cir NE, Tallahassee, FL 32301, commonly known as FCI Tallahassee. Ms. Perkins was released from FCI Tallahassee in or around August 2023, and currently resides in the State of Florida.

## Defendant

36.    Defendant United States of America (hereinafter "United States") is the appropriate defendant for Plaintiff's claims under the FTCA. The United States is a sovereign entity that has waived its immunity for certain claims, including the claims set forth herein, and is liable for the acts or omissions of its agents, servants, contractors, and employees that occur within the scope of their employment.

37.    At all times relevant hereto, Defendant United States, acting through the BOP, was responsible for the operation, control, supervision, policy, practice,

implementation, and conduct of all federal correctional matters including at FCI Tallahassee and was responsible for the hiring, retention, training, supervision, management, discipline, and conduct of all BOP personnel, including but not limited to Officer Hatten.

38.    In addition, at all relevant times, Defendant United States was responsible for enforcing the rules of the BOP, and for ensuring that BOP personnel obey the Constitution and laws of the United States.

39.    At all times relevant hereto, Defendant United States, acting through the BOP, hired Officer Hatten, as well as his colleagues and supervisors, to serve as "law enforcement officer" within the meaning of 28 U.S.C. § 2680(h).

40.    At all times relevant hereto, Officer Hatten was a sports specialist, recreational officer, correctional officer, and/or an employee of BOP and Defendant United States. In his capacity as an agent, servant, and employee of Defendant United States, and within the course and scope of his employment as such, Officer Hatten was responsible for the day-to-day oversight, supervision, safekeeping, care, custody, control, direction, protection, safety, and well-being of people confined at FCI Tallahassee, including Plaintiff.

41.    At all times relevant hereto, Officer Hatten's colleagues and supervisors, including other recreational officers and correctional officers, were also employees of BOP and Defendant United States. In their capacity as agents, servants,

and employees of Defendant United States, and within the course and scope of their employment as such, these officers were responsible for the day-to-day oversight, supervision, safekeeping, care, custody, control, direction, protection, safety, and well-being of people confined at FCI Tallahassee, including Plaintiff.

42.   At all times relevant hereto, Officer Hatten was an agent, representative, or employee of Defendant United States. At all times relevant hereto, Officer Hatten was the authorized agent, servant, or contractor of Defendant United States, acting with the permission, ratification, approval, and consent of Defendant United States.

43.   At all times relevant hereto, Officer Hatten's colleagues and supervisors, including other recreational officers and correctional officers, were also agents, representatives, or employees of Defendant United States. At all times relevant hereto, these officers acted within the course and scope of said agency, representation, or employment and were within the scope of their authority, whether actual or apparent. At all times relevant hereto, these officers were the authorized agents, partners, servants, or contractors of Defendant United States, and the acts and omissions herein alleged were done by these officers acting through such capacity, within the scope of their authority, with the permission, ratification, approval, and consent of Defendant United States.

## JURY DEMAND

44.     Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs hereby demand a trial by jury on all issues and claims in this action that are so triable.

## FACTUAL BACKGROUND

## INDICATIONS AND WARNING SIGNS OF HATTEN'S SEXUAL ABUSE

45.     Plaintiffs hereby repeat, reiterate, and incorporate by reference paragraphs 36 through 43 with the same force and effect as if fully set forth herein.

46.     Congress enacted the Prison Rape Elimination Act (hereinafter "PREA") in 2003, 34 U.S.C. §§ 30301, *et seq.* to establish national standards for preventing and responding to sexual abuse of prisoners. Pursuant to PREA, DOJ promulgated certain regulations, which remain binding on all BOP facilities, including FCI Tallahassee. *See* 28 C.F.R. § 115. Under PREA regulations, BOP is required to "train all employees who may have contact with inmates" on the following: its "zero-tolerance policy for sexual abuse and sexual harassment"; "the right of inmates to . . . be free from retaliation for reporting sexual abuse and sexual harassment"; "signs and dynamics of prison sexual abuse"; and "how to avoid inappropriate relationships with inmates." *Id.* § 115.31(a).

47.     In addition, BOP's policies titled "program statements" set forth rules and procedures that all BOP employees were required to follow during relevant time periods:

a. Program Statement 3420.11 (Standards of Employee Conduct) mandates that "[n]o employee shall engage in, or allow another person to engage in, sexual behavior with an inmate. There is never any such thing as *consensual* sex between staff and inmates."

b. Program Statement 3420.11 states that BOP employees are subject to administrative action, up to and including removal, for any inappropriate contact, sexual behavior, or relationship with prisoners, regardless of whether such contact constitutes a prosecutable crime. Physical contact is not required to subject an employee to sanctions for misconduct of a sexual nature.

c. Program Statement 3420.11 goes on to state that "[a]ll allegations of sexual abuse will be thoroughly investigated and, when appropriate, referred to authorities for prosecution."

d. Program Statement 5324.12 (Sexually Abusive Behavior Prevention and Intervention Program) implements a zero-tolerance policy toward all forms of staff-on-prisoner sexual abuse, including sexual harassment.

e. Program Statement 5324.12 mandates that "[a]ll staff must report information concerning incidents or possible incidents of sexual

abuse or sexual harassment to the Operations Lieutenant, or where

appropriate, in accordance with the Program Statement 3420.11."

48.    BOP policy requires training of all employees who may have contact with prisoners on how to fulfill their responsibilities under these rules and procedures.

49.    Upon information and belief, Officer Hatten's employment at FCI Tallahassee began in or around 2018.

50.    Prior to being placed in FCI Tallahassee, Officer Hatten worked at Marianna Camp, another female BOP facility that is located about an hour away from FCI Tallahassee in the State of Florida. Upon information and belief, BOP personnel at Marianna Camp were made aware of Officer Hatten giving commissary items or paying for phone minutes for certain women prisoners, which was a warning sign of inappropriate relations. Knowing this, BOP still placed Officer Hatten in FCI Tallahassee, a female facility where he would have access to more victims.

51.    Throughout the time that Officer Hatten worked as a sports specialist and/or correctional officer at FCI Tallahassee, from around 2018 through August 2022, the warning signs of his perversion were ample and obvious to any reasonable BOP personnel. He utilized similar methods to stalk, assault, abuse, and terrorize at least 11 different victims incarcerated at FCI Tallahassee. His routines and *modus*

*operandi* involved flagrant violations of FCI Tallahassee's security and operating protocols, which were and should have been obvious to other BOP personnel.

52.   From at least 2020 onward, certain agents, servants, contractors, and employees of BOP, including but not limited to unit managers, counselors, correctional officers, lieutenants, department heads, captains, supervisors, and executive staff, observed Officer Hatten placing himself in posts where he would be alone and unsupervised with prisoners on their job details. For instance, he volunteered to supervise women working at rec when other officers were not around, and he also worked overtime in food services to supervise women working in the kitchen.

53.   From at least 2020 onward, certain agents, servants, contractors, and employees of BOP, including but not limited to unit managers, counselors, correctional officers, lieutenants, department heads, captains, supervisors, and executive staff, observed Officer Hatten spending substantial amounts of time alone with incarcerated women. They also observed him escorting certain women to various isolated areas within FCI Tallahassee, which were typically "blind spots" that were not captured by security cameras. There was no legitimate explanation as to why Officer Hatten frequently accompanied incarcerated women to these blind spots by himself.

54.    Officer Hatten, as a correctional officer, knew how to identify various blind spots that fell outside of the view of the security cameras, such as rec shack, upstairs rec, and a storage room by the laundry. He repeatedly took advantage of these known blind spots to brutally abuse his victims, including Plaintiffs, by raping them, forcing them to perform oral sex, digitally penetrating their vaginas, and/or fondling their body. Other BOP officers knew of, and disregarded, Officer Hatten's abnormal behavior of repeatedly isolating himself with certain prisoners and locking himself inside secluded structures with certain prisoners.

55.    Officer Hatten also abused his authority and flaunted his power by providing his victims with certain benefits or promises of benefits. For example, Officer Hatten promised Ms. Greene that he would assist her with an early release, as a way of manipulating her and making her feel indebted to him. Officer Hatten also frequently brought contraband and gifts to his victims, including all three Plaintiffs, which should have been obvious to other BOP personnel. Had BOP personnel conducted the needed investigations into the benefits that certain prisoners had received from Officer Hatten, they would have discovered and stopped his sexual abuse before he began to rape and sexually assault the Plaintiffs in 2021 or 2022.

56.    At FCI Tallahassee, Officer Hatten quickly developed a widespread reputation among women prisoners for being a "pervert" who said and did

inappropriate things to them. This reputation was well known to other BOP personnel, including but not limited to unit managers, counselors, correctional officers, lieutenants, department heads, captains, supervisors, and executive staff.

57. With the COVID-19 pandemic, Officer Hatten's sexual abuse escalated. For social distancing purposes, correctional officers including Officer Hatten were given more power to isolate prisoners and control the prisoners' movements throughout the facility. Officer Hatten used this power to isolate, terrorize, and abuse his victims at his will. In addition, with COVID-19, other officers, particularly those working in rec, were even less likely to oversee or intervene in Officer Hatten's suspicious conduct than before.

58. Upon information and belief, Officer Cornelius Jones ("Officer Jones"), another correctional officer who was frequently assigned to recreation, worked hours that overlapped with Officer Hatten's shift. Instead of accompanying and monitoring Officer Hatten as he should have, Officer Jones allowed Officer Hatten to take women to various isolated locations, including the rec shack, by himself, and often personally sent prisoners to see Officer Hatten by themselves. Officer Jones knew or should have known that Officer Hatten was acting inappropriately with certain women and/or bringing them contraband gifts. Nonetheless, Officer Jones turned a blind eye and allowed Officer Hatten unfettered access to his victims. Officer Jones himself was verbally abusive to prisoners, calling

them ugly, fat, "bitch," or sexually degrading terms, supporting his dismissive attitude towards Officer Hatten's sexually abusive conduct.

59. Upon information and belief, Officer Eric Love ("Officer Love"), another correctional officer who was frequently assigned to recreation, worked hours that overlapped with Officer Hatten's shift. Instead of accompanying and monitoring Officer Hatten as he should have, Officer Love allowed Officer Hatten to take women to various isolated locations, including the rec shack, by himself. Officer Love knew or should have known that Officer Hatten was acting inappropriately with certain women and/or bringing them contraband gifts. Upon information and belief, Officer Love had witnessed a prior incident wherein another officer at FCI Tallahassee, Jimmy Highsmith, had sexually abused a woman and was eventually convicted of that crime. Therefore, Officer Love knew or should have known the indications, signs, and concerns of Officer Hatten's sexually abusive conduct. Nonetheless, Officer Love turned a blind eye and allowed Officer Hatten unfettered access to his victims.

60. Upon information and belief, Officer Larry Mitchell ("Officer Mitchell"), another correctional officer who was frequently assigned to recreation, worked hours that overlapped with Officer Hatten's shift. Instead of accompanying and monitoring Officer Hatten as he should have, Officer Mitchell allowed Officer Hatten to take women to various isolated locations, including the rec shack, by

himself, and often personally sent prisoners to see Officer Hatten by themselves. Officer Mitchell knew or should have known that Officer Hatten was acting inappropriately with certain women and/or bringing them contraband gifts. Nonetheless, Officer Mitchell turned a blind eye and allowed Officer Hatten unfettered access to his victims.

61.    Upon information and belief, Officer Nicole Lakoe Jackson ("Officer Jackson"), another correctional officer who was frequently assigned to recreation, worked hours that overlapped with Officer Hatten's shift and had a close friendship with Hatten. Instead of accompanying and monitoring Officer Hatten as she should have, Officer Jackson allowed Officer Hatten to take women to various isolated locations, including the rec shack, by himself, and often personally sent prisoners to see Officer Hatten by themselves. Officer Jackson knew or should have known that Officer Hatten was acting inappropriately with certain women and/or bringing them contraband gifts. In fact, upon information and belief, around October 2021, Officer Jackson made a comment to Ms. Hernandez and another prisoner that, "y'all need to go sit outside with y'all daddy," referring to Officer Hatten. There was also a separate incident in 2021 when the Warden and Assistant Warden reprimanded Officer Hatten and Officer Jackson for allowing certain inmates to stay in rec during the hours they were not allowed to be there. Despite her apparent awareness of inappropriate relationships between Officer Hatten and certain women, Officer

Jackson turned a blind eye and allowed Officer Hatten unfettered access to his victims.

62. Upon information and belief, Officer Lee Adamson ("Officer Adamson") was the recreation supervisor with authority over Officer Hatten as well as Officers Jones, Love, Mitchell, and Jackson. Instead of monitoring, supervising, and disciplining Officer Hatten as he should have, Officer Adamson allowed Officer Hatten to take women to various isolated locations, including the rec shack, by himself. Officer Adamson knew or should have known that Officer Hatten was acting inappropriately with certain women and/or bringing them gifts. Nonetheless, Officer Adamson turned a blind eye and allowed Officer Hatten unfettered access to his victims. Upon information and belief, Officer Adamson favored Officer Hatten over other recreational officers and condoned his inappropriate behavior, emboldening Officer Hatten to use the prison facility as his personal brothel. For example, Officer Adamson would give Officer Hatten the first chance at overtime assignments before other recreation officers.

63. Upon information and belief, Lieutenant FNU Paramour, as the SHU officer, observed Officer Hatten visiting female inmates while they were detained in the SHU. Despite Officer Hatten having no legitimate purpose for being there, no BOP personnel including Officer Paramour ever questioned Officer Hatten or the female inmates about these abnormal and unusual visits.

64. Given the overtness and frequency with which Officer Hatten preyed upon women who were under his custody, other BOP personnel suspected or should have suspected that Officer Hatten was sexually abusing prisoners. Binding PREA regulations mandate staff reporting, whereby all BOP staff are required to "report immediately . . . **any knowledge, suspicion, or information** regarding an incident of sexual abuse or sexual harassment that occurred in a facility. . .; retaliation against inmates or staff who reported such an incident; and any staff neglect or violation of responsibilities that may have contributed to an incident or retaliation." 28 C.F.R. § 115.61(a). When an incarcerated person is subject to a substantial risk of imminent sexual abuse, BOP shall take immediate action to protect that person. *See* 28 C.F.R. § 115.62. In addition, administrative investigations of alleged sexual abuse by a staff member are required to proceed "promptly, thoroughly, and objectively for all allegations, including third-party and anonymous reports." *Id.* § 115.71(a). The presumptive disciplinary sanction for substantiated allegations of sexual abuse is termination. *See id.* § 115.76(b). Victims shall also be offered medical and mental health care by the BOP. *See id.* § 115.83.

65. Defendant United States and its agents, servants, contractors, and employees including but not limited to Officers Jones, Love, Mitchell, Jackson, Adamson, and Paramour had numerous opportunities to follow the above-mentioned mandates and stop Officer Hatten's misconduct. Officer Hatten's actions were

abnormal, obvious, and suspicious for sexual misconduct. In addition, upon information and belief, correctional officers in the control room were charged with monitoring the security cameras and following up on any suspicious activities that they noticed on the cameras. These officers, whose identity is currently unknown to the Plaintiffs, saw or should have seen that Officer Hatten frequently disappeared into unmonitored areas with prisoners who were not authorized to be in those areas alone with an officer. Nevertheless, BOP personnel took no actions to investigate or stop Officer Hatten's suspicious and recurrent behavior.

66.    Defendant United States and its agents, servants, contractors, and employees including but not limited to Officers Jones, Love, Mitchell, Jackson, Adamson, and Paramour failed to investigate, discipline, supervise, monitor, question, or stop Officer Hatten despite numerous indications of sexual misconduct. This was in direct violation of mandatory BOP policies, was not related to a discretionary function or duty, and served no plausible penological policy purpose.

67.    Defendant United States and its agents, servants, contractors, and employees including but not limited to Officers Jones, Love, Mitchell, Jackson, Adamson, and Paramour condoned, permitted, acquiesced to, consented to, and tacitly approved Officer Hatten's longstanding abuse of prisoners. Officer Hatten's ongoing abuse of multiple prisoners at FCI Tallahassee was so widely known throughout the prison that the staff turned it into a running joke. Instead of following

protocols to protect the prisoners in their care, the prison staff sat around making jokes at their expense. Their actions – and inactions – allowed Officer Hatten to rape and abuse multiple women with impunity.

68. Before Officer Hatten orally raped Ms. Perkins in May 2021, orally and vaginally raped Ms. Greene in the summer of 2021, and orally raped Ms. Dover in the spring of 2022, agents, servants, contractors, and employees of BOP, including at least some of the unit managers, counselors, correctional officers, lieutenants, department heads, captains, supervisors, executive staff, associate wardens, wardens, and investigators at FCI Tallahassee, were aware of suspicions, indications, or concerns regarding Officer Hatten's sexual misconduct. They were aware of Officer Hatten's frequent protocol violations and unexplained suspicious interactions with certain prisoners. Nonetheless, they refused to take the required action to report, monitor, supervise, or investigate Officer Hatten.

69. It is extraordinary and inexplicable that Defendant United States continued to allow Officer Hatten to spend time alone with female prisoners in isolation, creating daily opportunities for him to commit additional sexual assaults.

70. The fact that Officer Hatten could get away with sexual abuse while flagrantly violating BOP's policies led his victims, including the Plaintiffs, to believe that he was untouchable. The victims had legitimate concerns that they would suffer retaliation or other substantial harm if they were to report Officer Hatten's assaults.

To further fuel this fear, Officer Hatten verbally threatened his victims, including the Plaintiffs, to ensure their silence. He reminded his victims that he had the power to take away their privileges, transfer them to a different facility away from their families, put them in the SHU, or take away their job.

71.    BOP personnel at FCI Tallahassee, including lieutenants, department heads, captains, supervisors, executive staff, associate wardens, wardens, and investigators, knew Officer Hatten's reputation as a sexual predator. They also knew that female prisoners are reluctant to come forward with information regarding staff sexual abuse for fear of reprisal and loss of work privileges. Despite these known issues, FCI Tallahassee granted Officer Hatten unrestricted and unsupervised contact with numerous women, emboldening him to abuse his position of authority to threaten, violate, and assault his victims.

**HISTORY OF SEXUAL ABUSE AT FCI TALLAHASSEE – "DEN OF DESPAIR"**

72.    FCI Tallahassee has a long and sordid history of sexual abuse within its facility by correctional officers against the prisoners whom they were duty-bound to protect.

73.    The facility first gained notoriety in 2006 when there was a shoot-out between a correctional officer and Federal Bureau of Investigation ("FBI") agents

that led to the death of two people. In that case, the FBI was present to investigate and arrest six guards for sexually abusing the female prisoners in their custody.[2]

74.    FCI Tallahassee has one of the highest rates of staff-on-prisoner abuse complaints in the country, receiving more than 130 complaints since 2012.[3] It is highly likely that the problem is even more widespread than this figure suggests, but that it goes largely unchecked because of cultural tolerance, cover-ups, and organizational reprisals against prisoners who dare to report staff abuse.

75.    Physician assistant Paul Rolston is alleged to have sexually abused numerous women under his care in FCI Tallahassee beginning in around 2018. Despite several civil complaints filed against PA Rolston, instead of firing this serial abuser, FCI Tallahassee simply transferred him to a male facility, continuing the cycle of silence and abuse at FCI Tallahassee and further perpetuating the environment that protected the abusers at the cost of vulnerable women.[4]

76.    In August 2021, Officer Phillip Golightly was sentenced to 24-months' imprisonment for sexually abusing female prisoners in his care.[5] Even though

---

[2] *2 federal employees die in Fla. prison shooting*, NBC News, June 21, 2006 at 9:23 AM, https://www.nbcnews.com/id/wbna13415618

[3] Silja J.A. Talvi, *WOMEN REPORT 'RAMPANT' SEXUAL ABUSE AT FEDERAL PRISON WHERE GHISLAINE MAXWELL IS HELD*, The Appeal, Apr 25, 2023, https://theappeal.org/fci-tallahassee-sexual-abuse-women-prison-ghislaine-maxwell/

[4] *Id.*

[5] *Former Bureau of Prisons Correctional Officer Sentenced to 24 Months In Federal Prison For Sexually Abusing Prisoners*, Press Release U.S. Attorney's Office, Northern District of Florida, Aug. 27, 2021, https://www.justice.gov/usao-ndfl/pr/former-bureau-prisons-correctional-officer-sentenced-24-months-federal-prison-sexually.

Officer Golightly was indicted for, and pled guilty to, sexual abuse of only one victim, additional victims who suffered sexual abuse by Officer Golightly were acknowledged as part of the court records.[6] Upon information and belief, Officer Hatten and Officer Golightly, a convicted sexual abuser, were friendly with each other and knew about each other's sexually abusive conduct. In the same way that Officer Hatten summonsed his victims to the isolated rec shack, including some like Ms. Perkins who did not even work in rec, Officer Golightly called his victims to food services to sexually assault them, even though they did not even work in food services.

77.    In December 2021, another former recreational specialist at FCI Tallahassee, Officer Jimmy Lee Highsmith, was found guilty by a jury of sexually abusing a prisoner.[7] Upon information and belief, numerous complaints were filed against Officer Highsmith by women at FCI Tallahassee beginning around 2014, and yet BOP personnel at FCI Tallahassee ignored these complaints to keep him employed as a supervisor for women working in rec—same as in Officer Hatten's case.

---

[6] *Id.*

[7] *Jury Convicts Former Tallahassee Federal Correctional Officer Of Sexual Abuse of Prisoner*, Press Release U.S. Attorney's Office, Northern District of Florida, Dec. 17, 2021, https://www.justice.gov/usao-ndfl/pr/jury-convicts-former-tallahassee-federal-correctional-officer-sexual-abuse-inmate.

78.    These are not the only correctional officers who reportedly sexually abused prisoners at FCI Tallahassee during relevant period. For example, at least one civil lawsuit has been filed against Officer Antoine J. Hand.

79.    There are many similarities in *modus operandi* of Officers Golightly, Highsmith, Hand, and Officer Hatten's sexual abuse, including taking women to off-camera areas by themselves and/or using their jobs as a basis for sexual coercion. Therefore, BOP personnel at FCI Tallahassee, including but not limited to recreational officers, supervisors, executive staff, and investigators, knew or should have known that Officer Hatten's conduct was highly indicative of sexual abuse. Nonetheless, BOP personnel violated their mandatory obligations under applicable BOP protocols as well as regulations including 28 CFR § 115.61, wherein all staff members must immediately report "any knowledge, suspicion, or information regarding an incident of sexual abuse or sexual harassment that occurred in a facility."

80.    BOP personnel's reckless disregard of the safety and welfare of victims including Plaintiffs is highlighted by the fact that multiple correctional officers were sexually assaulting women incarcerated at FCI Tallahassee throughout the relevant times. Officer Hatten fed into, and was also encouraged and enabled by, this toxic culture at FCI Tallahassee.

81.   Despite BOP's purported zero-tolerance policy, sexual abuse of incarcerated people is an issue endemic to BOP, beyond FCI Tallahassee as well. In 2022, the U.S. Senate Permanent Subcommittee on Investigations issued a report (hereinafter "the PSI Report"), which found that over the past decade, BOP employees sexually abused female prisoners in at least two-thirds of federal prisons that have held women (19 out of 29 facilities). The PSI Report found that Defendant United States' management failures enabled continued sexual abuse of incarcerated people by BOP personnel. The PSI Report specifically found that the United States, through BOP, "failed to detect, prevent, and respond to sexual abuse of female prisoners in its custody."[8]

82.   Despite this established history of sexual abuse in BOP custody and at FCI Tallahassee specifically, Defendant United States failed to institute a reliable practice for detecting and stopping sexual abuse of incarcerated people. As a telling example, FCI Tallahassee's PREA audit reports that were published on or around July 6, 2021, and July 4, 2023, claimed that FCI Tallahassee was compliant with all PREA standards. Even though this audit report was published after PA Rolston and Officers Golightly, Highsmith, and Hatten's sexual abuse became public through

---

[8] S. PERMANENT SUBCOMM. ON INVESTIGATIONS, REP. ON SEXUAL ABUSE OF FEMALE INMATES IN FEDERAL PRISONS, 18 (Dec. 13, 2022), https://www.ossoff.senate.gov/wp-content/uploads/2022/12/PSI-Embargoed-Staff-Report-re-Sexual-Abuse-of-Female-Inmates-in-Federal-Prisons.pdf at 4.

criminal investigation, this obvious non-compliance with PREA standards cannot be found anywhere in the reports. This blatant deficiency reflects the culture of Defendant United States of turning a blind eye to BOP sexual abuse of incarcerated people.

83.     Based on the history of sexual abuse at FCI Tallahassee, Defendant United States had actual notice and knowledge that correctional officers could abuse their position of power to sexually assault prisoners, including in off-camera areas.

84.     Nevertheless, Defendant United States failed to take adequate steps to prevent Officer Hatten from engaging in recurrent sexual abuse, including by installing additional security cameras to eliminate the blind spots. This was in direct violation of mandatory and non-discretionary BOP policies, which required that BOP staff eliminate any known blind spots and install sufficient video monitoring to prevent sexual abuse.

85.     Upon information and belief, from around August 2019 through July 2022, Officer Hatten sexually abused numerous women in his custody at FCI Tallahassee. Other than the three Plaintiffs, eight additional women have reported Officer Hatten's abuse to the BOP and/or FBI and other external investigative agencies.

86.    Defendant United States and its agents, servants, contractors, and employees failed to remedy the culture of staff sexual abuse at FCI Tallahassee before, during, and after Officer Hatten's rapes and abuse of the Plaintiffs.

## OFFICER HATTEN's SEXUAL ABUSE OF PLAINTIFFS

87.    Emboldened by other BOP personnel's failure to stop him, with increasing fearlessness, Officer Hatten used the tools available to him through the BOP, such as access to prisoners, control over their jobs and livelihood, and blind spots from cameras, to violate and terrorize his victims, including Plaintiffs.

*Facts Pertaining to Plaintiff Ms. Greene*

88.    Ms. Greene first arrived at FCI Tallahassee in or around February 2017 at 35 years of age. She remained incarcerated there until around September 2021 when she was briefly transferred to Marianna Camp, and again from December 2021 through December 2022 when she was released from BOP custody.

89.    Throughout this time, Ms. Greene was under the custodial care, supervision, and control of the agents, servants, employees, and independent contractors of Defendant United States and/or BOP, including Officer Hatten and other officers at FCI Tallahassee whose identities are not presently known. As a matter of both federal and state law, Defendant United States had an absolute non-delegable duty to see that prisoners in its custody receive adequate custodial care and supervision; to maintain the safety, health, and well-being of the prisoner

population; and to prevent prisoners such as Ms. Greene from being subjected to undue harm and/or cruel and unusual punishment. Defendant United States abjectly failed to carry out these duties.

90.    At FCI Tallahassee, Ms. Greene held various job positions, starting in UNICOR, then rec, kitchen, and later laundry. UNICOR is a call center where prisoners can work as a service representative to sell goods and services. She first encountered Officer Hatten in mid-2018 when she would sometimes work in rec. At the time, Officer Hatten was still an employee at Marianna Camp but would occasionally fill the rec shifts at FCI Tallahassee due to staff shortages. After Hurricane Michael, Marianna Camp was shut down upon information and belief, and Officer Hatten began to work at FCI Tallahassee full time.

91.    These initial interactions with Officer Hatten were friendly. Ms. Greene would frequently encounter Officer Hatten as she was hired by Officer Johnson in or around November 2018 to work full time in the rec. Officer Hatten began working at FCI Tallahassee full-time in or around 2019 and would normally work in rec.

92.    One day in or around August 2019, Ms. Greene went to the officer station on the second floor, in upstairs rec, to retrieve supplies for arts and crafts. While there, Officer Hatten rubbed against her backside, smacked or patted her buttocks, and gave her a sexual look. Ms. Greene interpreted Officer Hatten's behavior that day as testing the waters, to see what she would do in response to this

physical contact. At that time, out of fear and nervousness, Ms. Greene laughed off the incident and left the area.

93. Following this first incident of physical contact, Officer Hatten continued to make sexually explicit comments to Ms. Greene such as "You're going to be my baby." He would take opportunities to pat or smack her buttocks when she would walk past him. Ms. Greene did not know what to do, so continued to laugh off these encounters.

94. The abuse escalated further a few weeks later, in or around September or October 2019. Officer Hatten saw Ms. Greene walking in the rec yard to go to the DTS office and told her to stop by his office "on the way back." She interpreted this to refer to his office in the rec shack. She complied and went to his office, which was far in the back of the rec shack past two doors from the entrance. When she arrived, she saw Officer Hatten seated at his desk with his pants halfway down and his erection visible. He appeared to think that he could do this as he felt her up during the previous incident. Officer Hatten implied that Ms. Greene was the cause of his erection and arousal, saying something to the effect of "See, this is what you do to me." Officer Hatten proceeded to proposition Ms. Greene for sex, but she refused and left the office, making an excuse that she needs to make the 3pm move for which she is only allowed 10 minutes for the movement.

95.     In or around November 2019, Ms. Greene began working in the rec shack, which Officer Hatten directly supervised. When possible, Officer Hatten would approach her and make inappropriate sexual comments.

96.     After COVID pandemic hit in March 2020, Officer Hatten gained more control over escorting certain women to their work and isolating them in certain locations. With fewer people around, he was able to isolate his victims into the upstairs rec or rec shack with little concern that other officers would walk in. Around mid-2020, he began to lock certain women into the rec shack, so they would not be able to escape him. Hoping to avoid further abuse by Officer Hatten, Ms. Greene stopped working in the rec shack and tried to stay in the housing unit. Officer Hatten then made Ms. Greene a "recreation liaison" for her unit. Ms. Greene believes that Officer Hatten intended to keep her under his control and watch.

97.     Officer Hatten continued to groom Ms. Greene by making inappropriate sexual comments to her. For example, on one occasion, Officer Hatten approached Ms. Greene and asked her if she had a girlfriend. When she said no, Officer Hatten said "You better not have no motherfucking girlfriend." On another occasion, Officer Hatten also discussed sexual abuse of other inmates with Ms. Greene, telling her that Officer Highsmith was getting in trouble for sexually abusing an inmate.

98.    Officer Hatten also groomed Ms. Greene by gifting her with contraband items that are not available within the prison, such as jewelry, perfume, lotion, body wash, brand clothes, and fast food like Popeyes chicken. Upon information and belief, Officer Hatten was previously reprimanded at Marianna Camp for putting money on certain women's accounts, and therefore resorted to giving Ms. Greene these contraband items instead so that she could either use them herself or sell them for money.

99.    Other BOP personnel, including Ms. Greene's unit team, with due diligence, should have noticed that Ms. Greene had routine access to things that she could only have received from an officer with outside contact. This type of favoritism is expressly prohibited by the BOP protocols and should have been immediately reported and investigated so that it would not progress further. Instead, Officer Hatten was allowed unfettered access to Ms. Greene.

100.    Upon information and belief, providing contraband to prisoners is a common, predatory tactic used in the context of staff-on-prisoner sexual abuse and should have resulted in termination of Officer Hatten. Instead, Officer Hatten was allowed to continue his predatory conduct.

101.    In 2021, the COVID-19 restrictions were gradually lifted throughout the facility. Around this time, Officer Hatten began to promise Ms. Greene that he would speak to her case manager Ms. FNU Thomas (hereinafter "Officer Thomas")

and "put in a good word" for her to obtain an early release through the CARES Act. Such preferential treatment is not allowed and should have been strictly scrutinized by the BOP.

102.   In or around June 2021, Ms. Greene changed her job from rec to laundry. When she worked in laundry, Ms. Greene's hours were 6:00 AM to 2:00 PM, so she arrived at work at approximately 5:45 AM each day to start washing the prisoners' clothes. At that time in the morning, there was no movement in the compound, and there would be no other prisoner in the laundry area. Upon information and belief, around this time, even though Officer Hatten was still assigned to the rec detail, he frequently picked up overtime shifts from 10:00 PM to 6:00 AM in food services (colloquially known as "the kitchen") to interact with prisoners working there. Unfortunately for Ms. Greene, the kitchen was located near the laundry area where she was working, and Officer Hatten seized the opportunity to corner Ms. Greene.

103.   Officer Hatten repeatedly took Ms. Greene to a back dock area, shared by the kitchen and the laundry, to speak with her when she showed up to work. This was yet another blind spot from surveillance camera at FCI Tallahassee. That said, BOP personnel monitoring the cameras should have seen Officer Hatten repeatedly taking Ms. Greene to an unmonitored area in the early morning hour and staying there, by themselves, for close to half an hour at a time. Yet not a single BOP

employee questioned Officer Hatten's interest in Ms. Greene or their prolonged interactions off camera.

104.  During these interactions, Officer Hatten initially continued to make promises regarding Ms. Greene's CARES Act application and to make sexually explicit comments. These discussions quickly escalated to Officer Hatten ordering her to meet him in a storage room, located in the back dock of laundry where prisoners put their clothes. There is no security camera around this storage room, which Officer Hatten knew.

105.  On a weekday around July 2021, Officer Hatten told Ms. Greene to meet him in that storage room. Upon her arrival that morning, he kissed her and told her that she "needed" to do something "for him." Ms. Greene felt numb and unable to say no to Officer Hatten, who then forced her to perform oral sex on him and then vaginally penetrated her.

106.  Officer Hatten made sure that he was the only correctional officer working the graveyard shift in the laundry and kitchen area. As an officer assigned to rec, there was no legitimate reason he was spending so much time near the laundry facilities, in isolation with Ms. Greene. However, none of Officer Hatten's colleagues intervened to stop Officer Hatten's inappropriate conduct.

107.  Following this initial rape, Officer Hatten took every opportunity to call Ms. Greene to the storage room in the early morning to see him.

108. Approximately a week and a half after the first rape, Officer Hatten again met Ms. Greene in the storage room, fondled her breasts and vagina, and forced her to give him oral sex for a second time.

109. Again, about a week or two later, on or around August 1, 2021, Officer Hatten forced Ms. Greene to perform oral sex on him for a third time in the storage room. Ms. Greene recalls the date as that was around the time that she followed up with her case manager Officer Thomas regarding her CARES Act application and learned that Officer Hatten had in fact never tried to help her. Ms. Greene felt used and "stupid."

110. Then, in or around August or September 2021, the day before Ms. Greene was scheduled to meet with her case manager for a meeting, Officer Hatten forced Ms. Greene to perform oral sex on him for a fourth time and vaginally raped her for a second time in the storage room.

111. The frequency and violence of these sexual assaults were astonishing. Between approximately July 2021 and September 2021, Ms. Greene was forced to perform oral sex on Officer Hatten about four times and was vaginally raped by him without protection twice.

112. Consistent with his *modus operandi*, Officer Hatten habitually took advantage of his institutional power, knowledge, and resources to isolate Ms. Greene

in off-camera areas without interruption. There were no security cameras that captured the laundry back dock or the storage room.

113.   Upon information and belief, there were several BOP officers who were tasked with monitoring the security cameras throughout FCI Tallahassee. Incarcerated people are not allowed to be alone in an off-camera area with an officer. Therefore, the BOP officers who were monitoring the security cameras were, and/or should have been, suspicious of Officer Hatten spending so much time alone and off-camera with Ms. Greene. Nonetheless, no BOP personnel came to investigate, intervene, or inquire as to Officer Hatten's interactions with Ms. Greene. This failure cannot be explained without deliberate indifference, recklessness, and carelessness of the Defendant United States and its agents, servants, contractors, and employees towards the risk of sexual abuse that incarcerated women face.

114.   Officer Hatten's sudden interest in picking up additional overtime shifts in the kitchen and spending substantial amount of time in the laundry back dock was highly suspicious. It was clear that he was trying to get every opportunity to have one-on-one access to prisoners, including Ms. Greene, and there were many opportunities for his colleagues and supervisors, including but not limited to Officers Jones, Love, Mitchell, Jackson, and Adamson, to report and stop Officer Hatten's suspicious behavior. This was in violation of 28 CFR § 115.61, wherein all staff members must immediately report "any knowledge, suspicion, or information

regarding an incident of sexual abuse or sexual harassment that occurred in a facility."

115. BOP officers who were in the laundry or kitchen area during the morning hours should have seen the suspicious interactions between Officer Hatten and Ms. Greene. For instance, upon information and belief, the laundry officer Ms. FNU Copeland (hereinafter "Officer Copeland") was sometimes around, looking for Ms. Greene. Nonetheless, Officer Copeland violated her obligations under 28 CFR § 115.61 to immediately report "any knowledge, suspicion, or information regarding an incident of sexual abuse or sexual harassment that occurred in a facility." In the alternative, if Officer Copeland in fact reported her suspicion or knowledge pursuant to the regulations, the administrators who received the report failed to take appropriate action to immediately investigate and sanction Officer Hatten for his conduct.

116. Upon learning at the subsequent meeting that Officer Hatten had still not spoken with Officer Thomas, Ms. Greene decided that she must escape Officer Hatten and that the only way to do so was to escape FCI Tallahassee. Ms. Greene submitted a request for transfer to Marianna Camp, which was approved. When Officer Hatten found out that Ms. Greene had applied for the transfer, he confronted her stating, "There's plenty of y'all, you can be replaced." Ms. Greene took this

comment as confirmation that Officer Hatten was sexually abusing other prisoners as well; and that he never cared about her well-being.

117.    As Ms. Greene continuously asked Officer Thomas regarding whether Officer Hatten had spoken on her behalf, Officer Thomas knew or should have known that there was a suspicious relationship between the two that went beyond the ethical boundaries of staff and prisoner. Officer Thomas violated her mandatory obligations under applicable BOP protocols as well as regulations including 28 CFR § 115.61, wherein all staff members must immediately report "any knowledge, suspicion, or information regarding an incident of sexual abuse or sexual harassment that occurred in a facility." In the alternative, if Officer Thomas in fact reported her suspicion or knowledge pursuant to the regulations, the administrators who received the report failed to take appropriate action to immediately investigate and sanction Officer Hatten for his conduct.

118.    In or around September 2021, Ms. Greene was transferred to Marianna Camp. Unfortunately, Ms. Greene's escape from Officer Hatten's abuse was short lived as she was returned to FCI Tallahassee on or around December 13, 2021 because of a disciplinary violation. Ms. Greene was placed in the SHU for about 63 days at FCI Tallahassee.

119.    The SHU placement gave Officer Hatten a further opportunity to accost and harass Ms. Greene. Even though he was never a SHU officer, Officer Hatten

took on additional shifts or overtime at the SHU and left his assigned posts to go to the SHU. He would do "rounds" in the SHU, constantly pass by Ms. Greene's cell, and ask how she was doing. Other BOP personnel knew or should have known that Officer Hatten's sudden interest in the SHU was highly suspicious, but they did not intervene.

120. Upon information and belief, other officers, such as Lieutenant FNU Paramour, observed Officer Hatten visiting Ms. Greene's SHU cell, even though he had no legitimate purpose for being there. Nonetheless, no BOP personnel questioned Officer Hatten or Ms. Greene about these visits.

121. Ms. Greene was released from the SHU in or around February 2022. Officer Hatten did not rape her again. Ms. Greene believes that this was because he had turned his attention to another victim, not because he had stopped sexually abusing women. There was an occasion when Officer Hatten again exposed his penis to her in his office in the rec shack and said, "What do you want to do?" Ms. Greene rejected his proposition and left. She also decided not to work in rec anymore to minimize her contact with Officer Hatten. That said, when they ran into each other, Officer Hatten did not stop making inappropriate comments to Ms. Greene such as, "You not gonna be my boo no more, not gonna fuck with me like that?" or "That was fucked up how you left me." He did not seem afraid of getting caught.

122. Despite being aware of Officer Hatten's suspicious behavior, his colleagues and supervisors refused to take any action, allowing him to act with impunity. When Ms. Greene did her best to avoid him, Officer Hatten made threatening comments like "Don't look for me to do anything for you." He would also find opportunities to touch her body, and in particular pat her buttocks over her clothes. Ms. Greene recalls that the last time this happened was around March 1, 2022.

123. Ms. Greene did not report Officer Hatten's abuse while she was in custody because of FCI Tallahassee's poor reporting and confidentiality protocols. When she attempted to make a comment to an officer about the abuse, it was laughed off. When she attempted to speak to a psychologist, which is supposed to be confidential, the psychologist referred her to a male lieutenant, which made Ms. Greene uncomfortable. She was also told that they could not help her. Even beyond her own situation, Ms. Greene had previously witnessed a counselor at FCI Tallahassee rip up another prisoner's grievance regarding sexual abuse, and officers joking about how low the prison sentences are for raping prisoners. Ms. Greene felt that she had to prioritize serving her prison time without risking retaliation from Officer Hatten or his colleagues. She knew that if she were to report him, she could be placed in the SHU or be transferred to a facility further away from her home.

124. Indeed, after Ms. Hernandez reported Officer Hatten to BOP officials in August 2022, Ms. Greene heard multiple officers say that they "saw it coming," implying that they knew about Officer Hatten's misconduct for a long time and did not do anything about it.

125. Throughout relevant times, Defendant United States' agents, servants, contractors, and employees at FCI Tallahassee, including but not limited to Officers Jones, Love, Mitchell, Jackson, Adamson, Paramour, Copeland, and/or Thomas were aware of facts from which the inference could be drawn that a substantial risk of serious harm existed to Plaintiff Ms. Greene's safety under Officer Hatten's purported custodial, supervisory, and disciplinary care. Nonetheless, they took no steps to keep Ms. Greene safe from Officer Hatten, in violation of mandatory BOP policies and federal regulations.

126. Defendant United States' agents, servants, contractors, and employees knew or should have known of the substantial problems and shortcomings at FCI Tallahassee: in the training that staff receive regarding sexual abuse; the glaring lack of security cameras in certain locations of the facility; the system for reporting sexual abuse complaints; the treatment of victims who reported sexual abuse; the oversight of the sexual abuse prevention program; the actual violations of BOP security and operating protocols including by Officer Hatten; and his propensity in engaging in sexually inappropriate and abusive behavior. They took no reasonable steps to

remedy these issues and instead assumed and/or acquiesced in the risk of injuring victims such as Ms. Greene, demonstrating a plain disregard of an excessive risk to her safety and welfare.

127. The repeated horrors that Officer Hatten inflicted on the Plaintiff occurred only as a direct result of the negligence, gross negligence, carelessness, recklessness, and deliberate indifference of numerous BOP officials, up and down the chain of command.

128. To this day, Ms. Greene is continuing to suffer profound trauma resulting from Officer Hatten's assaults. Since her release from custody in December 2022, Ms. Greene has been diagnosed with PTSD, anxiety, sexual dysfunction, and depression due to the abuse. She suffers from suicidal thoughts, disturbances in her interpersonal relationships, and other severe psychological difficulties. Like many abuse survivors, Ms. Greene places blame on herself for these incidents.

129. As a result of the foregoing, Ms. Greene continues to suffer from debilitating psychological trauma, permanent and catastrophic psychological injuries, severe emotional distress, permanent physical ailments associated with psychological injuries, pain, humiliation, loss of enjoyment of life, and loss of quality of life. These injuries are expected to be permanent. Ms. Greene also suffers from other permanent injuries and deficits that will be established through expert consultation in this litigation.

130.    Upon information and belief, Ms. Greene will require sustained, long-term intensive psychiatric and/or psychological treatment with appropriate qualified experts. Even with such professional treatment, it is expected that Plaintiff's injuries and damages are permanent and will continue to severely impact her health, welfare, and daily functioning. To the extent that she suffered sexual victimization prior to incarceration, Plaintiff's psychological trauma and the resulting impairment were exacerbated because of Officer Hatten's rapes.

*Facts Pertaining to Plaintiff Ms. Perkins*

131.    Ms. Perkins arrived at FCI Tallahassee on or about January 27, 2021, at 44 years of age. She remained incarcerated there until around August 2023 when she was released from BOP custody.

132.    Throughout this time, Ms. Perkins was under the custodial care, supervision, and control of the agents, servants, employees, and independent contractors of Defendant United States and/or BOP, including Officer Hatten and other officers at FCI Tallahassee whose identities are not presently known. As a matter of both federal and state law, Defendant United States had an absolute non-delegable duty to see that prisoners in its custody receive adequate custodial care and supervision; to maintain the safety, health, and well-being of the prisoner population; and to prevent prisoners such as Ms. Perkins from being subjected to

undue harm and/or cruel and unusual punishment. Defendant United States abjectly failed to carry out these duties.

133. Ms. Perkins first encountered Officer Hatten shortly after her arrival at FCI Tallahassee. At the time, the facility was on lockdown in response to the COVID-19 pandemic, and prisoners were only allowed one hour per day of recreational time. Each unit was assigned a particular time of day that they could go to rec. Ms. Perkins met Officer Hatten during the allotted recreational time, as he was one of the guards on duty in the rec yard.

134. Using the COVID-19 pandemic to his advantage, Officer Hatten found ways to make sure that he was the only correctional officer escorting certain women to rec and staying with them in certain locations at rec. For example, he would take women to the rec shack while other officers were in upstairs rec, and vice versa. This was in violation of the operating protocols under which at least two officers should have supervised women working recreation details. However, none of Officer Hatten's colleagues, including Officers Jones, Love, Mitchell, and Jackson, or their supervisor Officer Adamson, intervened to stop Officer Hatten's inappropriate conduct.

135. Upon information and belief, around mid-2020, Officer Hatten began to lock certain women into the rec shack with an intent to abuse them there without interruption. This *modus operandi* continued undeterred, up to his assault of Ms.

Perkins in the rec shack in 2021. There were times when Officers Jones, Love, Mitchell, and Jackson, or their supervisor Officer Adamson would notice the rec shack door being locked. Even though they knew or should have known that Officer Hatten was there with a prisoner, they took no step to intervene or protect the prisoner.

136. Over the first few months of her incarceration, Ms. Perkins noticed Officer Hatten becoming friendlier and friendlier, showing an interest in her. Consistent with his pattern of abuse, Officer Hatten began providing Ms. Perkins with contraband such as food, lipstick, and earrings.

137. Upon information and belief, providing contraband to prisoners is a common, predatory tactic used in the context of sexual abuse and should have resulted in termination of Officer Hatten. At a minimum, other BOP staff, including Ms. Perkins's unit team, with due diligence, should have noticed that Ms. Perkins had access to things that she could only have received from an officer with outside contact. This type of favoritism is expressly prohibited by the BOP protocols and should have been immediately reported and investigated so that it would not progress further. Instead, Officer Hatten was allowed unfettered access to Ms. Perkins.

138. Officer Hatten knew, and took advantage of, the fact that Ms. Perkins was especially susceptible to the imbalance of power as she was relying on her family, including her children, to fund her commissary account. Ms. Perkins felt

immense distress and guilt for having to rely on her family for financial assistance while she was incarcerated, and Officer Hatten presented himself as her savior. At the time, she did not realize that he had an ulterior motive. She tried not to read much into Officer Hatten's increasingly personal questions about her life.

139. Starting in or around the spring of 2021, Officer Hatten began to order Ms. Perkins to come to the rec shack alone. Ms. Perkins did not even work in rec, and her presence in the rec shack alone with Officer Hatten should have raised suspicion to other BOP staff. Nonetheless, Officer Hatten repeatedly spent time with Ms. Perkins in the rec shack, and none of the other officers including Officers Adamson, Jones, Mitchell, Love, and Jackson intervened.

140. As such, Officers Adamson, Jones, Mitchell, Love, and Jackson violated their mandatory obligations under applicable BOP protocols as well as regulations including 28 CFR § 115.61, wherein all staff members must immediately report "any knowledge, suspicion, or information regarding an incident of sexual abuse or sexual harassment that occurred in a facility." In the alternative, if these officers in fact reported their suspicion or knowledge pursuant to the regulations, the administrators who received the report failed to take appropriate action to immediately investigate and sanction Officer Hatten for his conduct.

141. In the rec shack, Officer Hatten made increasingly inappropriate sexual comments to Ms. Perkins about her lips and body. Eventually, Officer Hatten said to

Ms. Perkins that he wanted to feel her mouth. When she did not know what he meant, Officer Hatten clarified that he wanted her to perform oral sex on him.

142.   Normally, prisoners were required to follow the rules to be either escorted by an officer from their unit to recreation or to go with other prisoners in their unit, but at Officer Hatten's behest, Ms. Perkins went to the rec shack by herself with no supervision. She also spent a substantial amount of time with him inside the rec shack, behind a locked door. There were no security cameras that captured the inside of the rec shack or Officer Hatten's office inside the rec shack. Nonetheless, BOP staff exercised no effort to investigate or stop Officer Hatten's suspicious conduct.

143.   Officer Hatten's actions escalated in or around May 2021, when Officer Hatten forced Ms. Perkins to perform oral sex on him in the rec shack. Officer Hatten locked the rec shack's door so that no one would be able to enter. Officer Hatten's act of locking himself inside the rec shack together with a prisoner should have been alarming and suspicious to other BOP officers including rec staff, and yet no one intervened to stop Officer Hatten's assault. Ms. Perkins felt obligated to comply with his demand as she was locked in the room with an officer. She also had to think about the fact that Officer Hatten had given her contraband and could turn on her.

144.   After this oral rape, Ms. Perkins felt disgusted, humiliated, and ashamed. She purposefully sought to avoid Officer Hatten as well as the rec shack

at all cost. Despite her efforts to avoid him, Officer Hatten continued to seek her out and demanded her to come see him again or to give him oral sex on numerous occasions. No officer reported his actions or took any steps to prevent his abuse.

145.    In addition, following the assault, Ms. Perkins made a sudden and drastic change in her dress and manner, wearing baggy clothing and avoiding going outside despite the limited rec time she had. No officer took steps or exercised due diligence to counsel her on this noticeable change.

146.    Consistent with his *modus operandi*, Officer Hatten habitually took advantage of his institutional power, knowledge, and resources to isolate Ms. Perkins in off-camera area without interruption. There were no security cameras that captured the inside of the rec shack where the rape occurred.

147.    Upon information and belief, there were several BOP officers who were tasked with monitoring the security cameras throughout FCI Tallahassee. Incarcerated people are not allowed to be alone in an off-camera area with an officer. Therefore, the BOP officers who were monitoring the security cameras were, and/or should have been, suspicious of Officer Hatten spending so much time alone and off-camera with Ms. Perkins. Nonetheless, no BOP personnel came to investigate, intervene, or inquire as to Officer Hatten's interactions with Ms. Perkins. This failure cannot be explained without deliberate indifference, recklessness, and carelessness

of the Defendant United States and its agents, servants, contractors, and employees towards the risk of sexual abuse that incarcerated women face.

148. Ms. Perkins did not report her abuse while she was incarcerated. She did not feel safe to do so. To this day, she is extremely distressed to recount the details of her abuse.

149. Throughout relevant times, Defendant United States' agents, servants, contractors, and employees at FCI Tallahassee, including but not limited to Officers Jones, Love, Mitchell, Jackson, and/or Adamson, were aware of facts from which the inference could be drawn that a substantial risk of serious harm existed to Plaintiff Ms. Perkins's safety under Officer Hatten's purported custodial, supervisory, and disciplinary care. Nonetheless, they took no steps to keep Ms. Perkins safe from Officer Hatten, in violation of mandatory BOP policies and federal regulations.

150. Defendant United States' agents, servants, contractors, and employees knew or should have known of the substantial problems and shortcomings at FCI Tallahassee: in the training that staff receive regarding sexual abuse; the glaring lack of security cameras in certain locations of the facility; the system for reporting sexual abuse complaints; the treatment of victims who reported sexual abuse; the oversight of the sexual abuse prevention program; the actual violations of BOP security and operating protocols including by Officer Hatten; and his propensity in engaging in

sexually inappropriate and abusive behavior. They took no reasonable steps to remedy these issues and instead assumed and/or acquiesced in the risk of injuring victims such as Ms. Perkins, demonstrating a plain disregard of an excessive risk to her safety and welfare.

151. The repeated horrors that Officer Hatten inflicted on the Plaintiff occurred only as a direct result of the negligence, gross negligence, carelessness, recklessness, and deliberate indifference of numerous BOP officials, up and down the chain of command.

152. To this day, Ms. Perkins is continuing to suffer the costs of her victimization at Officer Hatten's hands. Since her release from custody in August 2023, Ms. Perkins continues to struggle with a fear and distrust of men. This affects her relationships, self-esteem, and ability to participate in daily activities. She has been diagnosed with PTSD and depression with symptoms including intrusive thoughts, panic attacks, feeling of restlessness, nervousness, difficulties sleeping, hypervigilance, hyperarousal, avoidance of thinking about the assault, feelings of guilt and shame, as well as feelings of anger directed to Hatten, other men in general, and herself. She requires medication and therapy to manage her anxiety and panic attacks.

153. As a result of the foregoing, Ms. Perkins continues to suffer from debilitating psychological trauma, permanent and catastrophic psychological

injuries, severe emotional distress, permanent physical ailments associated with psychological injuries, pain, humiliation, loss of enjoyment of life, and loss of quality of life. These injuries are expected to be permanent. Ms. Perkins also suffers from other permanent injuries and deficits that will be established through expert consultation in this litigation.

154. Upon information and belief, Ms. Perkins will require sustained, long-term intensive psychiatric and/or psychological treatment with appropriate qualified experts. Even with such professional treatment, it is expected that Plaintiff's injuries and damages are permanent and will continue to severely impact her health, welfare, and daily functioning. To the extent that she suffered sexual victimization prior to incarceration, Plaintiff's psychological trauma and the resulting impairment were exacerbated because of Officer Hatten's assault.

*Facts Pertaining to Plaintiff Ms. Dover*

155. Ms. Dover arrived at FCI Tallahassee in approximately 2017 at 27 years of age. She remained there until December 2022 when she was released from BOP custody.

156. Throughout this time, Ms. Dover was under the custodial care, supervision, and control of the agents, servants, employees, and independent contractors of Defendant United States and/or BOP, including Officer Hatten and other officers at FCI Tallahassee whose identities are not presently known. As a

matter of both federal and state law, Defendant United States had an absolute non-delegable duty to see that prisoners in its custody receive adequate custodial care and supervision; to maintain the safety, health, and well-being of the prisoner population; and to prevent prisoners such as Ms. Dover from being subjected to undue harm and/or cruel and unusual punishment. Defendant United States abjectly failed to carry out these duties.

157. Using the COVID-19 pandemic to his advantage, Officer Hatten found ways to make sure that he was the only correctional officer escorting certain women to rec and staying with them in certain locations at rec. For example, he would take women to the rec shack while other officers were in upstairs rec, and vice versa. This was in violation of the operating protocols under which at least two officers should have supervised women working recreation details. However, none of Officer Hatten's colleagues, including Officers Jones, Love, Mitchell, and Jackson, or their supervisor Officer Adamson, intervened to stop Officer Hatten's inappropriate conduct.

158. Upon information and belief, around mid-2020, Officer Hatten began to lock certain women into the rec shack with an intent to abuse them there without interruption. This *modus operandi* continued undeterred, up to his assaults of Ms. Dover in the rec shack in 2022. There were times when Officers Jones, Love, Mitchell, and Jackson, or their supervisor Officer Adamson would notice the rec

shack door being locked. Even though they knew or should have known that Officer Hatten was there with a prisoner, they took no step to intervene or protect the prisoner.

159.   In or around the end of 2021, Ms. Dover was assigned to work as the AM administrative clerk in the recreation department. Ms. Dover began to frequently interact with Officer Hatten as part of her job. At the time, she worked with Officer Hatten in the morning shift, and Ms. Hernandez would work with him in the afternoon shift. The end of Ms. Dover's shift overlapped with Ms. Hernandez's shift.

160.   As he did with Ms. Greene and Ms. Perkins, Officer Hatten began approaching Ms. Dover by making inappropriate sexual comments to her about her appearance and her body. He also brought her gifts that she would otherwise not have access to within the prison, including lotion, perfume, earrings, and candy.

161.   Other BOP personnel, with due diligence, should have noticed that Ms. Dover had routine access to things that she could only have received from an officer with outside contact. This type of favoritism is expressly prohibited by the BOP protocols and should have been immediately reported and investigated so that it would not progress further. Instead, Officer Hatten was allowed unfettered access to Ms. Dover.

162.   Over time, Officer Hatten escalated his abuse and began physically assaulting Ms. Dover by touching her buttocks, breasts, and vagina over her clothes on multiple occasions. These incidents took place whenever the two were isolated, which was frequent. Officer Hatten made sure that he was the only correctional officer supervising prisoners working recreation details, so that he could spend time alone with his victims.

163.   Officer Hatten took every opportunity to spend time alone with Ms. Dover, for example in the rec shack after locking the door. This was well outside the normal routine and should have been noticed by other officers, including Officers Adamson, Jones, Mitchell, Love, and Jackson. These Officers violated their mandatory obligations under applicable BOP protocols as well as regulations including 28 CFR § 115.61, wherein all staff members must immediately report "any knowledge, suspicion, or information regarding an incident of sexual abuse or sexual harassment that occurred in a facility." In the alternative, if these officers in fact reported their suspicion or knowledge pursuant to the regulations, the administrators who received the report failed to take appropriate action to immediately investigate and sanction Officer Hatten for his conduct.

164.   Normally, prisoners were required to follow the rules to be either escorted by an officer from their unit to recreation or to go with other prisoners in their unit, but at Officer Hatten's behest, Ms. Dover went to the rec shack by herself

with no supervision. She also spent a substantial amount of time with him inside the rec shack, behind a locked door. There were no security cameras that captured the inside of the rec shack or Officer Hatten's office inside the rec shack. Nonetheless, BOP staff exercised no effort to investigate or stop Officer Hatten's suspicious conduct.

165. Over time, Officer Hatten also forced Ms. Dover to serve as a "lookout" when he abused or raped other victims, including Ms. Hernandez. Ms. Dover complied, hoping that he would not assault her directly. She did not feel that she had any other option, as she was a prisoner, and he was an officer.

166. Unfortunately, Officer Hatten's abuse continued to escalate, and, in the spring of 2022, Ms. Dover herself fell victim to Officer Hatten's sexual assault. In or around April or May 2022, Officer Hatten told Ms. Dover to come to the rec shack at around 6:00 AM, even though her direct supervisor, Officer Jones, was not present. Officer Jones had told Ms. Dover that she did not have to report at 6:00 AM that day because he was not coming in. It should have been apparent to BOP staff including Ms. Dover's unit team, as well as any rec staff that was present, that Ms. Dover being called to the rec shack to spend time alone with Officer Hatten at 6:00 AM was highly abnormal.

167. Nevertheless, Ms. Dover had no choice but to report to the rec shack at 6:00 AM. She was uncomfortable to realize that Officer Hatten was the only one

there. He asked her to make him coffee, asked her to sit down, and showed her some photos from his personal life on his computer. He then asked her to heat up food for him. As Ms. Dover turned away to heat up food as ordered, Officer Hatten began rubbing her buttocks and groin from behind. Then, he turned her around and forcibly put her hand on his erect penis.

168.  Ms. Dover froze, not knowing what to do. Officer Hatten proceeded to unzip his pants and force Ms. Dover to perform oral sex on him. He forcibly pushed her head down and made sexual comments about her lips. Ms. Dover felt mortified. She tried to gesture that someone may be coming to end the rape, but Officer Hatten apparently knew that no one would come and forced her to continue.

169.  Despite Ms. Dover's best efforts to avoid Officer Hatten after this oral rape, he continued to make sexual comments and grope Ms. Dover's body over her clothes when he had the opportunity, up until he disappeared from the facility in or around August 2022.

170.  Consistent with his *modus operandi*, Officer Hatten habitually took advantage of his institutional power, knowledge, and resources to isolate Ms. Dover in off-camera area without interruption. There were no security cameras that captured the inside of the rec shack where the rape occurred.

171.  Upon information and belief, there were several BOP officers who were tasked with monitoring the security cameras throughout FCI Tallahassee.

Incarcerated people are not allowed to be alone in an off-camera area with an officer. Therefore, the BOP officers who were monitoring the security cameras were, and/or should have been, suspicious of Officer Hatten spending so much time alone and off-camera with Ms. Dover. Nonetheless, no BOP personnel came to investigate, intervene, or inquire as to Officer Hatten's interactions with Ms. Dover. This failure cannot be explained without deliberate indifference, recklessness, and carelessness of the Defendant United States and its agents, servants, contractors, and employees towards the risk of sexual abuse that incarcerated women face.

172.   Ms. Dover was unable to report her abuse while she was incarcerated. She was fearful of losing her job and modest income associated with that job. She was also fearful of retaliation such as being placed in the SHU. This fear was reasonable as Ms. Dover observed it happening to other prisoners in similar circumstances.

173.   Throughout relevant times, Defendant United States' agents, servants, contractors, and employees at FCI Tallahassee, including but not limited to Officers Jones, Love, Mitchell, Jackson, and/or Adamson, were aware of facts from which the inference could be drawn that a substantial risk of serious harm existed to Plaintiff Ms. Dover's safety under Officer Hatten's purported custodial, supervisory, and disciplinary care. Nonetheless, they took no steps to keep Ms. Dover safe from Officer Hatten, in violation of mandatory BOP policies and federal regulations.

174. Defendant United States' agents, servants, contractors, and employees knew or should have known of the substantial problems and shortcomings at FCI Tallahassee: in the training that staff receive regarding sexual abuse; the glaring lack of security cameras in certain locations of the facility; the system for reporting sexual abuse complaints; the treatment of victims who reported sexual abuse; the oversight of the sexual abuse prevention program; the actual violations of BOP security and operating protocols including by Officer Hatten; and his propensity in engaging in sexually inappropriate and abusive behavior. They took no reasonable steps to remedy these issues and instead assumed and/or acquiesced in the risk of injuring victims such as Ms. Dover, demonstrating a plain disregard of an excessive risk to her safety and welfare.

175. The repeated horrors that Officer Hatten inflicted on the Plaintiff occurred only as a direct result of the negligence, gross negligence, carelessness, recklessness, and deliberate indifference of numerous BOP officials, up and down the chain of command.

176. Even though she was released from BOP custody in or around December 2022, Ms. Dover continues to experience depression, disordered eating, substance abuse, and emotional distress. Ms. Dover has experienced intrusive thoughts of the assaults and has suffered from greater feelings of isolation, withdrawal, fear, distrust, and anxiety, as well as suicidal thoughts. Her sleep, energy,

sexual interest, and appetite have been disturbed, affecting her employment and personal relationships. For example, Ms. Dover attempted to work as a waitress in a restaurant, but when a male supervisor flirted with her, she became so fearful that she had to leave the job. She knows that this is irrational but cannot help herself. She has been diagnosed with major depressive disorder, PTSD, alcohol use disorder, and an eating disorder, and continues to treat with a mental health provider.

177. As a result of the foregoing, Ms. Dover continues to suffer from debilitating psychological trauma, permanent and catastrophic psychological injuries, severe emotional distress, permanent physical ailments associated with psychological injuries, pain, humiliation, loss of enjoyment of life, and loss of quality of life. These injuries are expected to be permanent. Ms. Dover also suffers from other permanent injuries and deficits that will be established through expert consultation in this litigation.

178. Upon information and belief, Ms. Dover will require sustained, long-term intensive psychiatric and/or psychological treatment with appropriate qualified experts. Even with such professional treatment, it is expected that Plaintiff's injuries and damages are permanent and will continue to severely impact her health, welfare, and daily functioning. To the extent that she suffered sexual victimization prior to incarceration, Plaintiff's psychological trauma and the resulting impairment were exacerbated because of Officer Hatten's assaults.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

## NEGLIGENCE CLAIM UNDER FEDERAL TORT CLAIMS ACT
(Against Defendant United States)

179. Plaintiffs hereby repeat, reiterate, and incorporate by reference foregoing paragraphs relevant to their respective claims (*i.e.*, paragraphs 1 through 130 for Ms. Greene; paragraphs 1 through 87 and 131 through 154 for Ms. Perkins; and paragraphs 1 through 87 and 155 through 178 for Ms. Dover) with the same force and effect as if fully set forth herein.

*United States' liability for the acts and omissions of its employees*

180. At all relevant times, Defendant United States hired various correctional and/or administrative personnel at FCI Tallahassee, including Officer Jones, Officer Love, Officer Mitchell, Officer Jackson, Officer Adamson, as well as Officer Hatten's other colleagues and/or supervisors whose identity is currently unknown to the Plaintiffs. Within the scope of their employment, these individuals were tasked to and did provide custodial care, control, and supervision to people incarcerated at FCI Tallahassee, including but not limited to the Plaintiffs.

181. At all relevant times, FCI Tallahassee personnel including Officer Jones, Officer Love, Officer Mitchell, Officer Jackson, and Officer Adamson held themselves out to persons incarcerated at FCI Tallahassee, and in particular to Plaintiffs, as correctional and/or administrative personnel with the knowledge,

capacity, and ability to provide due care in accordance with standards of reasonable care common and acceptable in the community.

182.    At all relevant times, FCI Tallahassee personnel including Officer Jones, Officer Love, Officer Mitchell, Officer Jackson, and/or Officer Adamson, within the scope of their employment with the United States, owed a non-delegable duty of care to Plaintiffs while they were housed at FCI Tallahassee.

183.    It was the duty of Officer Jones, Officer Love, Officer Mitchell, Officer Jackson, and/or Officer Adamson as federal employees, while acting within the scope of their office or employment, to ensure that correctional and/or administrative personnel with a history of sexual assaults were not allowed to harm or injure other incarcerated people.

184.    It was the duty of Officer Jones, Officer Love, Officer Mitchell, Officer Jackson, and/or Officer Adamson as federal employees, while acting within the scope of their office or employment, to use reasonable care for the safety of incarcerated individuals within their custodies.

185.    It was the duty of Officer Jones, Officer Love, Officer Mitchell, Officer Jackson, and/or Officer Adamson as federal employees, while acting within the scope of their office or employment, to maintain, operate, and control FCI Tallahassee as a safe and secure space for persons in it, including but not limited to Plaintiffs.

186.   It was the duty of Officer Jones, Officer Love, Officer Mitchell, Officer Jackson, and/or Officer Adamson as federal employees, while acting within the scope of their office or employment, to provide adequate custody, control, supervision, and monitoring to persons at FCI Tallahassee, including but not limited to Plaintiffs.

187.   It was the duty of Officer Jones, Officer Love, Officer Mitchell, Officer Jackson, and/or Officer Adamson as federal employees, while acting within the scope of their office or employment, to adequately protect incarcerated people including Plaintiffs from the foreseeable harm inflicted by BOP personnel known to be dangerous, including Officer Hatten.

188.   As described in paragraphs 47, 55, 64-66, 79, 99-100, 114-115, 117, 125-126, 137, 140, 144, 149-150, 161, 163, and 173-174, it was the duty of Officer Jones, Officer Love, Officer Mitchell, Officer Jackson, and/or Officer Adamson as well as Officer Hatten's other colleagues and supervisors, as federal employees, while acting within the scope of their office or employment, to ensure that any suspicion or indication of sexual abuse was reported through the chain of command for full investigation. Such suspicion or indication of sexual abuse would include Officer Hatten's suspicious conduct as described in paragraphs 7, 11, 21, 113-115, 117, 119, 122, 142-143, 147, 164, and 171; his violation of the operating protocols and/or rules as described in paragraphs 18-21, 51, 68, 134, and 157; and his provision

of contraband and/or other benefits to his victims including the Plaintiffs as described in paragraphs 4, 6, 8, 20, 98, 136, 143, and 161.

189.   It was the duty of Officer Adamson and other supervisory officers whose identity is currently unknown to the Plaintiffs, as federal employees, while acting within the scope of their office or employment, to ensure that all BOP employees are trained, supervised, and monitored properly.

190.   As described in paragraphs 3, 5, 19, 53-54, 65, 83-84, 87, 103-104, 112, 146, 170, it was the duty of certain supervisory and/or administrative staff whose identity is currently unknown to the Plaintiffs, as federal employees, while acting within the scope of their office or employment, to ensure that security cameras are installed, monitored, and attended to throughout FCI Tallahassee, such that sexual assaults described herein would not occur under their watch.

191.   Officer Jones, Officer Love, Officer Mitchell, Officer Jackson, and/or Officer Adamson, as federal employees and while acting within the scope of their office or employment, breached each of the foregoing duties in paragraphs 180 through 190 that they owed to Plaintiffs by failing to take adequate steps to protect them from Officer Hatten promptly, despite the numerous warning signs and indications of sexual abuse presented by Officer Hatten. To the extent that any other correctional, supervisory, and/or administrative staff of FCI Tallahassee, such as SHU lieutenants (see paragraphs 63-67, 120), Plaintiffs' unit team (see paragraphs

99, 137, 166), case manager (see paragraphs 101, 109-110), or other job supervisors (see paragraph 115), were aware of Officer Hatten's sexually abusive conduct and turned a blind eye to it, they also breached the duties owed to the Plaintiffs by failing to take adequate steps to protect her from Officer Hatten promptly.

192. The breach by federal employees described in paragraph 191 directly exposed each Plaintiff to an unreasonable risk of bodily injury, causing her to fear for her life and safety, and resulted in her being assaulted by Officer Hatten as described above.

193. Officer Jones, as a federal employee and while acting within the scope of his employment, knew or should have known that Officer Hatten was likely to engage in criminal conduct that injured Plaintiffs and other people incarcerated at FCI Tallahassee.

194. Officer Jones, as a federal employee and while acting within the scope of his employment, knew or should have known that Officer Hatten had a propensity to sexually abuse prisoners because of his suspicious practices that violated BOP policies or federal regulations, including his pattern of spending time in off-camera spaces alone with prisoners and locking them into the rec shack with him, the history of staff sexual abuse at FCI Tallahassee with similar *modus operandi* as that of Officer Hatten, and/or prior reports or allegations made against Officer Hatten.

195. Officer Jones, as a federal employee and while acting within the scope of his employment, knew or should have known that there was an excessive risk that prisoners, and Plaintiffs in particular, would be sexually assaulted by Officer Hatten. As described in paragraphs 58, 134, 139, and 157-158, Officer Jones observed that Officer Hatten was interacting and meeting with prisoners including the Plaintiffs in an unusual manner, such that he knew or should have known to report the behavior, investigate further, and/or otherwise intervene to prevent any further sexual abuse, and yet he did not do so.

196. Officer Jones, as a federal employee and while acting within the scope of his employment, disregarded, or ignored numerous warning signs, indications, and complaints regarding Officer Hatten's sexually abusive behavior.

197. Despite actual and constructive notice of Officer Hatten's abuse, Officer Jones, as a federal employee and while acting within the scope of his employment, failed to take reasonable measures to provide each Plaintiff with a reasonably safe environment, and instead allowed Officer Hatten to repeatedly prey upon each Plaintiff without any restraints or supervision.

198. Despite actual and constructive notice of Officer Hatten's abuse, Officer Jones, as a federal employee and while acting within the scope of his employment, did not take reasonable, available measures to abate the risk of sexual

abuse to each Plaintiff, and to ensure her safety, in violation of federal regulations and BOP protocols.

199. Officer Jones, as a federal employee and while acting within the scope of his employment, assisted in creating and increasing the danger to each Plaintiff by enabling, permitting, condoning, tolerating, and failing to prevent Officer Hatten's recurrent sexual abuse. He enabled and acquiesced in Officer Hatten's conduct, thereby placing each Plaintiff directly in harm's way.

200. Officer Jones, as a federal employee and while acting within the scope of his employment, negligently failed to adequately monitor, supervise, investigate, or discipline Officer Hatten, allowing him to operate within FCI Tallahassee with impunity.

201. In each of the foregoing ways as alleged in paragraphs 193 through 200, Officer Jones did not possess the necessary skill to maintain a safe and secure environment and protect each Plaintiff from foreseeable harm.

202. In each of the foregoing ways as alleged in paragraphs 193 through 200, Officer Jones, as a federal employee and while acting within the scope of his employment, neglected to apply the skill he did have.

203. In each of the foregoing ways as alleged in paragraphs 193 through 200, Officer Jones, as a federal employee and while acting within the scope of his employment, did not use reasonable care in applying the skill he had.

204. Officer Love, as a federal employee and while acting within the scope of his employment, knew or should have known that Officer Hatten was likely to engage in criminal conduct that injured Plaintiffs and other people incarcerated at FCI Tallahassee.

205. Officer Love, as a federal employee and while acting within the scope of his employment, knew or should have known that Officer Hatten had a propensity to sexually abuse prisoners because of his suspicious practices that violated BOP policies or federal regulations, including his pattern of spending time in off-camera spaces alone with prisoners and locking them into the rec shack with him, the history of staff sexual abuse at FCI Tallahassee with similar *modus operandi* as that of Officer Hatten, and/or prior reports or allegations made against Officer Hatten.

206. Officer Love, as a federal employee and while acting within the scope of his employment, knew or should have known that there was an excessive risk that prisoners, and Plaintiffs in particular, would be sexually assaulted by Officer Hatten. As described in paragraphs 59, 134, 139, and 157-158, Officer Love observed that Officer Hatten was interacting and meeting with prisoners including the Plaintiffs in an unusual manner, such that he knew or should have known to report the behavior, investigate further, and/or otherwise intervene to prevent any further sexual abuse, and yet he did not do so.

207. Officer Love, as a federal employee and while acting within the scope of his employment, knew that there were prior incidents at FCI Tallahassee where officers sexually abused prisoners with similar *modus operandi* as Officer Hatten's, and yet ignored the blatant suspicions and/or indications of Hatten's sexual abuse.

208. Officer Love, as a federal employee and while acting within the scope of his employment, disregarded, or ignored numerous warning signs, indications, and complaints regarding Officer Hatten's sexually abusive behavior.

209. Despite actual and constructive notice of Officer Hatten's abuse, Officer Love, as a federal employee and while acting within the scope of his employment, failed to take reasonable measures to provide each Plaintiff with a reasonably safe environment, and instead allowed Officer Hatten to repeatedly prey upon each Plaintiff without any restraints or supervision.

210. Despite actual and constructive notice of Officer Hatten's abuse, Officer Love, as a federal employee and while acting within the scope of his employment, did not take reasonable, available measures to abate the risk of sexual abuse to each Plaintiff, and to ensure her safety, in violation of federal regulations and BOP protocols.

211. Officer Love, as a federal employee and while acting within the scope of his employment, assisted in creating and increasing the danger to each Plaintiff by enabling, permitting, condoning, tolerating, and failing to prevent Officer

Hatten's recurrent sexual abuse. He enabled and acquiesced in Officer Hatten's conduct, thereby placing each Plaintiff directly in harm's way.

212.   Officer Love, as a federal employee and while acting within the scope of his employment, negligently failed to adequately monitor, supervise, investigate, or discipline Officer Hatten, allowing him to operate within FCI Tallahassee with impunity.

213.   In each of the foregoing ways as alleged in paragraphs 204 through 212, Officer Love did not possess the necessary skill to maintain a safe and secure environment and protect each Plaintiff from foreseeable harm.

214.   In each of the foregoing ways as alleged in paragraphs 204 through 212, Officer Love, as a federal employee and while acting within the scope of his employment, neglected to apply the skill he did have.

215.   In each of the foregoing ways as alleged in paragraphs 204 through 212, Officer Love, as a federal employee and while acting within the scope of his employment, did not use reasonable care in applying the skill he had.

216.   Officer Mitchell, as a federal employee and while acting within the scope of his employment, knew or should have known that Officer Hatten was likely to engage in criminal conduct that injured Plaintiffs and other people incarcerated at FCI Tallahassee.

217. Officer Mitchell, as a federal employee and while acting within the scope of his employment, knew or should have known that Officer Hatten had a propensity to sexually abuse prisoners because of his suspicious practices that violated BOP policies or federal regulations, including his pattern of spending time in off-camera spaces alone with prisoners and locking them into the rec shack with him, the history of staff sexual abuse at FCI Tallahassee with similar *modus operandi* as that of Officer Hatten, and/or prior reports or allegations made against Officer Hatten.

218. Officer Mitchell, as a federal employee and while acting within the scope of his employment, knew or should have known that there was an excessive risk that prisoners, and Plaintiffs in particular, would be sexually assaulted by Officer Hatten. As described in paragraphs 60, 134, 139, and 157-158, Officer Mitchell observed that Officer Hatten was interacting and meeting with prisoners including the Plaintiffs in an unusual manner, such that he knew or should have known to report the behavior, investigate further, and/or otherwise intervene to prevent any further sexual abuse, and yet he did not do so.

219. Officer Mitchell, as a federal employee and while acting within the scope of his employment, disregarded, or ignored numerous warning signs, indications, and complaints regarding Officer Hatten's sexually abusive behavior.

220. Despite actual and constructive notice of Officer Hatten's abuse, Officer Mitchell, as a federal employee and while acting within the scope of his employment, failed to take reasonable measures to provide each Plaintiff with a reasonably safe environment, and instead allowed Officer Hatten to repeatedly prey upon each Plaintiff without any restraints or supervision.

221. Despite actual and constructive notice of Officer Hatten's abuse, Officer Mitchell, as a federal employee and while acting within the scope of his employment, did not take reasonable, available measures to abate the risk of sexual abuse to each Plaintiff, and to ensure her safety, in violation of federal regulations and BOP protocols.

222. Officer Mitchell, as a federal employee and while acting within the scope of his employment, assisted in creating and increasing the danger to each Plaintiff by enabling, permitting, condoning, tolerating, and failing to prevent Officer Hatten's recurrent sexual abuse. He enabled and acquiesced in Officer Hatten's conduct, thereby placing each Plaintiff directly in harm's way.

223. Officer Mitchell, as a federal employee and while acting within the scope of his employment, negligently failed to adequately monitor, supervise, investigate, or discipline Officer Hatten, allowing him to operate within FCI Tallahassee with impunity.

224. In each of the foregoing ways as alleged in paragraphs 216 through 223, Officer Mitchell did not possess the necessary skill to maintain a safe and secure environment and protect each Plaintiff from foreseeable harm.

225. In each of the foregoing ways as alleged in paragraphs 216 through 223, Officer Mitchell, as a federal employee and while acting within the scope of his employment, neglected to apply the skill he did have.

226. In each of the foregoing ways as alleged in paragraphs 216 through 223, Officer Mitchell, as a federal employee and while acting within the scope of his employment, did not use reasonable care in applying the skill he had.

227. Officer Jackson, as a federal employee and while acting within the scope of her employment, knew or should have known that Officer Hatten was likely to engage in criminal conduct that injured Plaintiffs and other people incarcerated at FCI Tallahassee.

228. Officer Jackson, as a federal employee and while acting within the scope of her employment, knew or should have known that Officer Hatten had a propensity to sexually abuse prisoners because of his suspicious practices that violated BOP policies or federal regulations, including his pattern of spending time in off-camera spaces alone with prisoners and locking them into the rec shack with him, the history of staff sexual abuse at FCI Tallahassee with similar *modus operandi*

as that of Officer Hatten, and/or prior reports or allegations made against Officer Hatten.

229. Officer Jackson, as a federal employee and while acting within the scope of her employment, knew or should have known that there was an excessive risk that prisoners, and Plaintiffs in particular, would be sexually assaulted by Officer Hatten. As described in paragraphs 61, 134, 139, and 157-158, Officer Jackson observed that Officer Hatten was interacting and meeting with prisoners including the Plaintiffs in an unusual manner, such that she knew or should have known to report the behavior, investigate further, and/or otherwise intervene to prevent any further sexual abuse, and yet she did not do so.

230. Officer Jackson, as a federal employee and while acting within the scope of her employment, disregarded, or ignored numerous warning signs, indications, and complaints regarding Officer Hatten's sexually abusive behavior.

231. Despite actual and constructive notice of Officer Hatten's abuse, Officer Jackson, as a federal employee and while acting within the scope of her employment, failed to take reasonable measures to provide each Plaintiff with a reasonably safe environment, and instead allowed Officer Hatten to repeatedly prey upon each Plaintiff without any restraints or supervision.

232. Despite actual and constructive notice of Officer Hatten's abuse, Officer Jackson, as a federal employee and while acting within the scope of her

employment, did not take reasonable, available measures to abate the risk of sexual abuse to each Plaintiff, and to ensure her safety, in violation of federal regulations and BOP protocols.

233. Officer Jackson, as a federal employee and while acting within the scope of her employment, assisted in creating and increasing the danger to each Plaintiff by enabling, permitting, condoning, tolerating, and failing to prevent Officer Hatten's recurrent sexual abuse. She enabled and acquiesced in Officer Hatten's conduct, thereby placing each Plaintiff directly in harm's way.

234. Officer Jackson, as a federal employee and while acting within the scope of her employment, negligently failed to adequately monitor, supervise, investigate, or discipline Officer Hatten, allowing him to operate within FCI Tallahassee with impunity.

235. In each of the foregoing ways as alleged in paragraphs 227 through 234, Officer Jackson did not possess the necessary skill to maintain a safe and secure environment and protect each Plaintiff from foreseeable harm.

236. In each of the foregoing ways as alleged in paragraphs 227 through 234, Officer Jackson, as a federal employee and while acting within the scope of her employment, neglected to apply the skill she did have.

237. In each of the foregoing ways as alleged in paragraphs 227 through 234, Officer Jackson, as a federal employee and while acting within the scope of her employment, did not use reasonable care in applying the skill she had.

238. Officer Adamson, as a federal employee and while acting within the scope of his employment, knew or should have known that Officer Hatten was likely to engage in criminal conduct that injured Plaintiffs and other people incarcerated at FCI Tallahassee.

239. Officer Adamson, as a federal employee and while acting within the scope of his employment, knew or should have known that Officer Hatten had a propensity to sexually abuse prisoners because of his suspicious practices that violated BOP policies or federal regulations, including his pattern of spending time in off-camera spaces alone with prisoners and locking them into the rec shack with him, the history of staff sexual abuse at FCI Tallahassee with similar *modus operandi* as that of Officer Hatten, and/or prior reports or allegations made against Officer Hatten.

240. Officer Adamson, as a federal employee and while acting within the scope of his employment, knew or should have known that there was an excessive risk that prisoners, and Plaintiffs in particular, would be sexually assaulted by Officer Hatten. As described in paragraphs 62, 134, 139, and 157-158, Officer Adamson observed that Officer Hatten was interacting and meeting with prisoners including

the Plaintiffs in an unusual manner, such that he knew or should have known to report the behavior, investigate further, and/or otherwise intervene to prevent any further sexual abuse, and yet he did not do so.

241. Officer Adamson, as a federal employee and while acting within the scope of his employment, disregarded, or ignored numerous warning signs, indications, and complaints regarding Officer Hatten's sexually abusive behavior.

242. Despite actual and constructive notice of Officer Hatten's abuse, Officer Adamson, as a federal employee and while acting within the scope of his employment, failed to take reasonable measures to provide each Plaintiff with a reasonably safe environment, and instead allowed Officer Hatten to repeatedly prey upon each Plaintiff without any restraints or supervision.

243. Despite actual and constructive notice of Officer Hatten's abuse, Officer Adamson, as Officer Hatten's direct supervisor, allowed him unfettered access to his victims under the pretext of supervising female prisoners working in recreation.

244. Despite actual and constructive notice of Officer Hatten's abuse, Officer Adamson, as a federal employee and while acting within the scope of his employment, did not take reasonable, available measures to abate the risk of sexual abuse to each Plaintiff, and to ensure her safety, in violation of federal regulations and BOP protocols.

245. Officer Adamson, as a federal employee and while acting within the scope of his employment, assisted in creating and increasing the danger to each Plaintiff by enabling, permitting, condoning, tolerating, and failing to prevent Officer Hatten's recurrent sexual abuse. He enabled and acquiesced in Officer Hatten's conduct, thereby placing each Plaintiff directly in harm's way.

246. Officer Adamson, as a federal employee and while acting within the scope of his employment, negligently failed to adequately monitor, supervise, investigate, or discipline Officer Hatten, allowing him to operate within FCI Tallahassee with impunity.

247. In each of the foregoing ways as alleged in paragraphs 238 through 246, Officer Adamson did not possess the necessary skill to maintain a safe and secure environment and protect each Plaintiff from foreseeable harm.

248. In each of the foregoing ways as alleged in paragraphs 238 through 246, Officer Adamson, as a federal employee and while acting within the scope of his employment, neglected to apply the skill he did have.

249. In each of the foregoing ways as alleged in paragraphs 238 through 246, Officer Adamson, as a federal employee and while acting within the scope of his employment, did not use reasonable care in applying the skill he had.

250. United States is the sole proper defendant for each breach of duty by federal employees, Officers Jones, Love, Mitchell, Jackson, and/or Adamson alleged

in foregoing paragraphs 182 through 249 under the FTCA. United States is vicariously liable for the acts or omissions of its agents, servants, contractors, and/or employees that occur within the scope of their employment as here.

251. Each Plaintiff's injuries herein were proximately caused by the carelessness, recklessness, gross negligence, negligence, and deliberate indifference of United States' employees including Officers Jones, Love, Mitchell, Jackson, and/or Adamson, who were on duty and acting within the scope of their employment when they engaged in the wrongful conduct described herein.

252. Officer Jones, Officer Love, Officer Mitchell, Officer Jackson, and/or Officer Adamson's employment at FCI Tallahassee was essential to their commission of tortious misconduct, which could not have occurred absent their federal employment and related privileges.

253. Officer Jones, Officer Love, Officer Mitchell, Officer Jackson, and/or Officer Adamson's conduct was grossly negligent in that they were so careless as to show complete disregard for the rights and safety of each Plaintiff.

254. Officer Jones, Officer Love, Officer Mitchell, Officer Jackson, and/or Officer Adamson were aware of facts that gave rise to an unreasonable risk that each Plaintiff would be irreparably injured.

255. It was foreseeable to Officer Jones, Officer Love, Officer Mitchell, Officer Jackson, and/or Officer Adamson, based on the facts known to them, that each Plaintiff was at risk of imminent serious harm including sexual abuse.

256. Yet, Officer Jones, Officer Love, Officer Mitchell, Officer Jackson, and/or Officer Adamson in their official capacities failed and/or refused to prevent the abuse of each Plaintiff or to prevent its psychological consequences from worsening to the extent that they did.

257. Officer Jones, Officer Love, Officer Mitchell, Officer Jackson, and/or Officer Adamson, acting as agents, servants, contractors, and/or employees of the United States, knew that they had an opportunity to intervene and prevent the exacerbation of each Plaintiff's injuries and damages, and yet did not do so and instead inflicted unnecessary pain and suffering.

258. The failure of FCI Tallahassee personnel, including Officer Jones, Officer Love, Officer Mitchell, Officer Jackson, and/or Officer Adamson, to prevent, investigate, or acknowledge Officer Hatten's sexual abuse of prisoners, including Plaintiffs, served no legitimate policy purpose. On the contrary, FCI Tallahassee staff were required by mandatory BOP policies and federal regulations to immediately intervene and investigate when they learned of his suspected sexual abuse. The failure to do so by Officer Jones, Officer Love, Officer Mitchell, Officer Jackson,

and/or Officer Adamson, and/or other personnel currently unknown to Plaintiffs, was patently outside of their discretionary function.

*United States' liability for its own acts and omissions*

259.    Defendant United States also had independent duty owed to the Plaintiffs to adequately protect people incarcerated in its custody and to exercise due diligence in hiring, training, retaining, and supervising its employees.

260.    Defendant United States failed abjectly in its duty to detect, prevent, and investigate sexual abuse in its facility (see paragraphs 81-84), to safeguard its prisoners from its own employees (see paragraphs 89, 132, and 156), to provide psychological care and treatment to these victims (see paragraph 123), and to provide a reliable, confidential reporting mechanism (see paragraphs 24, 123, 148, 172).

261.    Defendant United States failed to provide reasonably safe environment to each Plaintiff, who was under its care, custody, and control without ability to escape.

262.    Each Plaintiff's injuries were direct and proximate consequences of Defendant United States' (a) failure to enforce zero-tolerance policy against sexually abusive conduct, 28 C.F.R. § 115.11; (b) failure to supervise, monitor, and surveil one-on-one physical contact between BOP personnel and incarcerated persons, 28 C.F.R. § 115.13; (c) decision to hire, retain, and promote BOP personnel who was

suspected or alleged to have had improper sexual contact, 28 C.F.R. § 115.17; (d) punishment of victims through disciplinary or retaliatory measures instead of providing proper support and protection, 28 C.F.R. § 115.43; (e) failure to report suspicion or allegation of sexual abuse, 28 C.F.R. § 115.61, Program Statement 5324.12; (f) failure to protect victims from retaliation after reporting sexual abuse, 28 C.F.R. § 115.67; (g) failure to promptly, thoroughly, and objectively investigate all allegations or reports, 28 C.F.R. § 115.71(a), Program Statement 3420.11; and (h) failure to discipline staff for sexual misconduct, 28 C.F.R. § 115.76.

263. Despite actual and constructive notice of Officer Hatten's abuse, Defendant United States acted negligently in improperly hiring, training, retaining, supervising, and/or disciplining Officer Hatten as described in paragraphs 46, 48, 50, 66, 69, and 71.

264. Despite actual and constructive notice of Officer Hatten's abuse, Defendant United States acted negligently in failing to adequately monitor, supervise, investigate, or discipline Officer Hatten, allowing him to operate with impunity.

265. Defendant United States acted negligently in hiring Officer Hatten, as well as Officers Jones, Love, Mitchell, Jackson, and/or Adamson, who did not possess the necessary skill to maintain safe and secure environment and protect each Plaintiff from foreseeable harm.

266.    Even though the United States' hiring, retention, and promotion of its employees are sometimes considered discretionary, when, as here, the United States was aware of its employees' tortious conduct, ignored and assisted in it, its retention of those employees does not represent a choice based on legitimate policy considerations.

267.    United States' acts and omissions as described in paragraphs 259 through 265 proximately caused each Plaintiff's injuries.

*Summary*

268.    The above-described acts and omissions of Officer Jones, Officer Love, Officer Mitchell, Officer Jackson, and/or Officer Adamson, and the United States constitute the tort of negligence under the laws of the State of Florida.

269.    Based on the foregoing circumstances, the United States, if it were a private person, would be liable to each Plaintiff in accordance with the laws of Florida, for the negligence upon each Plaintiff.

270.    Each Plaintiff's injuries were inflicted through no fault or want of care or contributory negligence on the part of the Plaintiff.

271.    Officer Hatten's rape and continued abuse of each Plaintiff meets Florida state's requirements for physical impact.

272.    As a direct and proximate result of the foregoing, Plaintiff Ms. Dover, Ms. Greene, and Ms. Perkins each suffered debilitating psychological trauma,

excruciating pain and suffering, emotional distress, permanent and catastrophic psychological injuries, permanent physical ailments associated with psychological injuries, humiliation, fear, depression, anxiety, frustration, loss of enjoyment and pleasures of life, loss of quality of life, and offenses to her personal dignity, as well as attendant damages, both general and special, including but not limited to any past and future medical expenses and economic injuries.

273.    As a direct and proximate result of the foregoing, Plaintiff Ms. Dover, Ms. Greene, and Ms. Perkins has each suffered serious harm including, without limitation, physical, psychological, emotional, mental, financial, and reputational harm, and therefore, is entitled to recover damages in an amount to be determined at trial.

WHEREFORE, Plaintiffs pray for judgment as set forth below.

## SECOND CLAIM FOR RELIEF

### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS CLAIM
### UNDER FEDERAL TORT CLAIMS ACT
### (Against Defendant United States)

274. Plaintiffs hereby repeat, reiterate, and incorporate by reference foregoing paragraphs relevant to their respective claims (*i.e.*, paragraphs 1 through 130 and 179 through 273 for Ms. Greene; paragraphs 1 through 87, 131 through 154, and 179 through 273 for Ms. Perkins; and paragraphs 1 through 87 and 155 through 273 for Ms. Dover) with the same force and effect as if fully set forth herein.

275. As described in paragraphs 179 through 273, Defendant United States, individually or through Officer Jones, Officer Love, Officer Mitchell, Officer Jackson, and/or Officer Adamson, in their official roles and capacities as agents, servants, contractors, and/or employees, directly caused, or disregarded a substantial probability of causing, severe emotional distress and mental injury to each Plaintiff.

276. The acts and omissions of Officer Jones, Officer Love, Officer Mitchell, Officer Jackson, and/or Officer Adamson, described in paragraphs 179 through 273, constituted extreme and outrageous conduct.

277. Each Plaintiff in fact suffered debilitating emotional suffering.

278. The above-described acts and omissions of Officer Jones, Officer Love, Officer Mitchell, Officer Jackson, and/or Officer Adamson constitute the tort of negligent infliction of emotional distress under the laws of the State of Florida.

279. Florida state law only recognizes this tort if it meets the requirements under the impact rule, which requires either physical touch or a physical manifestation of emotional distress. The "touch" requirement can be met with a foreign object, such as a gun or by a perpetrator's hands. Therefore, even without a physical manifestation of emotional harm, the Court can make a finding of negligent infliction of emotional distress. *See Willis v. Gami Golden Glades, LLC*, 967 So. 2d 846 (Fla. 2007).

280. Here, Officer Hatten raped and sexually abused each Plaintiff, meeting the requirement of both physical touch and physical manifestation of emotional distress. Officer Hatten's sexual abuse of each Plaintiff was severe and repetitive, and caused each Plaintiff physical pain and extreme emotional trauma.

281. Under the FTCA, Defendant United States of America is liable for the acts and omissions of its agents, servants, contractors, and/or employees that occurred within the scope of their employment as here.

282. Based on the foregoing circumstances, the United States, if it were a private person, would be liable to each Plaintiff in accordance with the laws of Florida, for the negligent infliction of emotional distress upon each Plaintiff.

283. As a direct and proximate result of the foregoing, Plaintiff Ms. Dover, Ms. Greene, and Ms. Perkins each suffered debilitating psychological trauma, excruciating pain and suffering, emotional distress, permanent and catastrophic psychological injuries, permanent physical ailments associated with psychological injuries, humiliation, fear, depression, anxiety, frustration, loss of enjoyment and pleasures of life, loss of quality of life, and offenses to her personal dignity, as well as attendant damages, both general and special, including but not limited to any past and future medical expenses and economic injuries.

284. As a direct and proximate result of the foregoing, Plaintiff Ms. Dover, Ms. Greene, and Ms. Perkins has each suffered serious harm including, without

limitation, physical, psychological, emotional, mental, financial, and reputational harm, and therefore, is entitled to recover damages in an amount to be determined at trial.

WHEREFORE, Plaintiffs pray for judgment as set forth below.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs Ashley Dover, Katoria Greene, and Alonia Perkins respectfully request that judgment be entered against Defendant United States, and that this Court grant the following to each Plaintiff:

1.  An award of compensatory damages for all injuries caused by the Defendant, including psychological and personal injuries, pain and suffering, emotional distress, humiliation, physical injuries, loss of enjoyment of life, loss of quality of life, and mental, financial, economic, and reputational damages, both past and future, general and special, and other harm, in an amount to be determined at trial;

2.  An award of pre- and post-judgment interest to the fullest extent permitted by law, for any and all monetary and/or non-monetary losses;

3.  An award of reasonable costs of suit and litigation expenses to the fullest extent permitted by law;

4.  An award of reasonable attorneys' fees to the fullest extent permitted by law; together with

5.     Such other and further relief at law or in equity as this Court may deem just and proper.


S/ *Jaehyun Oh*
**JAEHYUN OH***
The Jacob D. Fuchsberg Law Firm, LLP
3 Park Avenue, 37th Floor,
New York, NY 10016
New York Bar No. 5668512
Tel: (212) 869-3500 Ext. 245
j.oh@fuchsberg.com
*Attorney for Plaintiffs*
(* *Pro Hac Vice* Application Forthcoming)

S/ *Whitney Marie Untiedt*
**WHITNEY MARIE UNTIEDT**
Untiedt Dabdoub, PLLC
1600 Ponce De Leon Blvd., 10th Floor,
Coral Gables, FL 33134
Florida Bar No. 15819
Tel: (305) 330-2397
whitney@udlawyers.com
*Attorney for Plaintiffs*